THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. J. C. DWELLE.

1. RAILROAD PASSENGERS — *When Excess Fare Can be Lawfully Collected, When Not.* Before a railroad company can collect excess fare from a passenger who has not purchased a ticket, under the provisions of chapter 139 of the Laws of 1886 it must have a ticket office open for the sale of tickets at the station where passage is taken, at least thirty minutes prior to the departure of the train. A keeping of the office open for thirty minutes prior to the advertised time of departure will not suffice where the train is behind-time. If the office is not open, with an agent in the same, ready upon call to sell tickets, long enough before the actual departure of the train, whether delayed or not, to enable passengers to purchase tickets and safely board the train, no excess fare can be collected.

2. ————— *Tender of Fare after Expulsion Began — Correct Instruction.* In an action to recover damages for expulsion from the train for refusal to pay the fare demanded, the following instruction was given: "That if the passenger refused, when demanded, the fare he knew, or ought to have known, was justly due, and persisted in such refusal until the company in the exercise of its right to expel him therefor had taken the necessary steps to put him off, by commencing to stop the train, or seizing the person, if such seizure was necessary, such plaintiff was a trespasser, and by such act and conduct relieved the company of its obligation to carry him, and he could not reimpose such obligation on the company by making a tender of the sum due after having once refused it for the purpose and under the circumstances stated, and having put the company to the trouble of the performance of acts necessary to his safe and proper expulsion." *Held,* To be a correct rule under the facts of the case.

3. ————— *Erroneous Instruction.* An instruction that if the jury "believe from the evidence in the case that the plaintiff refused to pay the amount demanded of him, but that such refusal was not for the purpose of defrauding the company or unjustly withholding its legal dues, or vexing, annoying, delaying or putting to inconvenience the company's employés, but was done in good faith, under a mistaken belief that he was under no legal obligations to pay all that was demanded, and such honesty of purpose and belief was apparent from the manner, temper, demeanor and conduct of plaintiff, and the circumstances of the case, the company was bound to accept the sum previously refused, if tendered at any time before the actual expulsion, or after such expulsion and before the starting up of the train," is *held* to be erroneous.

4. ———— *Conduct of Counsel; Excessive Damages; New Trial.* Where
counsel for the prevailing party, in addressing the jury, brings be-
fore them extraneous matters and statements of facts not in evi-
dence, which are calculated to divert the attention of the jury from
the issues in the case, and to excite passion and prejudice against
the losing party, and the trial court upon a motion for a new trial
finds and states that the verdict returned by the jury was grossly
excessive, and that it was probably given under the influence of pas-
sion and prejudice arising from the misconduct of the prevailing
party, the verdict should be set aside and a new trial granted.

### Error from Marion District Court.

ACTION by J. C. Dwelle to recover damages from the
Atchison, Topeka & Santa Fé Railroad Company for wrong-
fully and forcibly ejecting him from one of its passenger
trains.  The plaintiff alleges that on April 13, 1887, he went
to the station of Cedar Grove for the purpose of taking
passage on the next train of the defendant to the city of Flor-
ence; that when he arrived at the station there was no agent
or person authorized to sell tickets at the station, and he was
unable to procure a ticket for such passage; that he then
went upon the train and tendered eighteen cents, which was
the legal fare due from Cedar Grove to Florence; that the
tender of eighteen cents was refused, and the collector of the
company demanded ten cents in excess of the legal fare; that
he thereupon tendered the sum of twenty-eight cents, but the
servants of the company refused to accept the tender or to
carry him upon the train, and forcibly and unlawfully ejected
him from its cars midway between Cedar Grove and Florence,
whereby he was greatly delayed and injured; and he prayed
damages in the sum of $25,000.  The answer of the defend-
ant was a general denial.  At the March term, 1888, a trial
was had with a jury, and, after hearing the testimony, the
following instructions were given by the court to the jury:

#### INSTRUCTIONS.

"The defendant is a common carrier, and bound to carry
on its passenger trains all persons who pay legal rates of fare,
and who conform to all the reasonable rules of the company;
and who do not deport themselves to the annoyance or danger

of the passengers, or its own employés.   Our statute de-
clares—

    " 'That in every case where any passenger on any railroad shall fail
or neglect to purchase a ticket for his or her journey prior to taking
passage on the train of such railroad company, it shall be lawful for
such railroad company to charge and collect from such passenger, in
excess of the legal rate of fare, the sum of ten cents for each journey
of fifteen miles or less; and the sum of fifteen cents for each journey
of more than fifteen miles and not exceeding fifty miles, and the sum
of twenty-five cents for each journey of fifty miles or more: *Provided*,
That this shall not apply to any passenger taking passage on any rail-
road trains (from any station) at which such railroad company fails to
keep tickets on sale, or at which such company shall neglect or fail to
keep its ticket office open for the sale of tickets at least thirty minutes
immediately prior to the starting of such train.' (Laws of 1886, ch. 139.)

    "The right of a railroad company to discriminate in its rates
of fare between those purchasing tickets and those who do not,
depends upon its compliance with the provisions of the statute
in regard to keeping its ticket office open for the required
length of time.   By keeping the ticket office open, is meant
keeping an office reasonably convenient of access and exit,
with an agent in the same or at hand, ready upon call to sell
its tickets, long enough before the starting of its train to enable
passengers to purchase tickets and safely board the train.
Only upon compliance with these legal requirements does it
obtain the right to charge the excess fare to a passenger who
has not purchased a ticket; and of course in a case where it
has no right to demand the excess fare, it has no right to ex-
pel a passenger who refuses to pay it when demanded.   Hence
if you believe from the evidence in this case that at the Cedar
Grove station on the day the plaintiff got on the defendant's
train, it did not keep its ticket office open in the manner and
for the time hereinbefore stated, so that plaintiff was unable
to purchase a ticket before entering the cars, the defendant's
employés had no right to demand an excess of fare from him
or to expel him for refusing to pay it.   But on the other
hand, if you believe from the evidence that the defendant did
so keep its ticket office open at such station, but the plaintiff
did not purchase a ticket before entering the cars, the employés
of the defendant had a right to demand the excess fare, and
had a right to expel plaintiff if he refused to pay the same,
and the failure of the plaintiff to reach the railroad station in
time to purchase a ticket before the train started, would not
relieve him from the obligation to pay such excess fare.

    "A person entering a railroad car should promptly on de-
mand produce and deliver to the proper employé a ticket for

his passage, or if he has no ticket, and has no legal excuse for failure to provide himself with one, should promptly on demand tender in money the legal chargeable fare including excess, if any there be, and upon a refusal by him to do so, if such refusal is with the intention and for the purpose of defrauding or unjustly withholding from the company its just dues, or unreasonably and wantonly vexing, delaying, annoying or putting to inconvenience the company's employés, he becomes a trespasser, and may be at once ejected from the train, unless prior to the time the company commences to exercise its right of ejection, as by commencing to stop its train for that purpose, or the seizure of his person by its servants, for the purpose of putting him off, he recants and offers to pay or deliver the ticket, in which case the company is bound to accept the same and allow him to ride; but if his refusal to pay or deliver a ticket is not done to defraud the company or to vexatiously annoy, delay, or inconvenience its employés, but is done with an honest belief as to his right to so refuse, and such motives for refusal are apparent from his temper, demeanor and conduct, and all the circumstances of the case, then the company is bound to accept the legal charges from him if tendered at any time before his expulsion, or even after the expulsion and before the starting up of the train. Hence if you believe from the evidence in this case that the plaintiff with intent to defraud the defendant and withhold from it its just dues, or for the purpose of vexatiously annoying, delaying and putting to inconvenience the company's employés, refused when demanded to pay the fare he knew or ought to have known was justly due, and persisted in such refusal until the company in the exercise of its right to expel him therefor, had taken the necessary steps to put him off, as by commencing to stop the train, or seizing his person if such seizure was necessary, such plaintiff was a trespasser by such acts and conduct, relieved the company of its obligation to carry him, and he could not reimpose such obligations on the company by making a tender of the sum due after having once refused it for the purpose and under the circumstances stated, and having put the company to the trouble of the performance of acts necessary to his safe and proper expulsion; but notwithstanding such refusal for such purpose and under such circumstances, if the plaintiff, prior to the taking of such steps by the company to expel him, tendered the proper amount to the proper employé, he was bound to accept it and permit the plaintiff to ride.

"But on the other hand, if you believe from the evidence in the case that the plaintiff refused to pay the amount demanded of him, but that such refusal was not for the purpose of defrauding the company or unjustly withholding its legal dues, or vexing, annoying, delaying or putting to inconvenience the company's employés, but was done in good faith under a mistaken belief that he was under no legal obligations to pay all that was demanded, and such honesty of purpose and belief was apparent from the manner, temper, demeanor and conduct of plaintiff, and the circumstances of the case, the company was bound to accept the sum previously refused, if tendered at any time before the actual expulsion, or after such expulsion and before the starting up of the train.

"In the expulsion of a passenger from a train no more force should be used than is necessary, and if any more is used by the company's employés than is necessary, the company is liable in damages from injuries resulting from such excessive force, if it is employed in the interest of the company and to effect the company's purpose in removing the passenger; but if an employé of the company after expelling such passenger makes the contest his own and commits an assault and battery after such expulsion, the company would not be liable. It is the duty of a person to avoid injury to himself as far as he reasonably can, and a person in a contest with another cannot, even though he be in the right, for the purpose of increasing the damages to himself, or for the purpose of subjecting his antagonist to other or greater liabilities, invite such antagonist to exert force upon him, or hold out against him until he does exert such force, when he knows such force will be exerted and injuries inflicted, and when all his legal rights as to the subject-matter of the contention can be preserved to him by peaceably submitting. In other words, a person cannot, when it is not necessary to the maintenance of his legal rights, invite another to commit a wrong upon him, or knowing that such other will commit such wrong, and that he cannot prevent it or successfully resist it hold out until he does, and then claim damage for the wrong done. A person is entitled to as much damage for a wrong done or injury quietly endured as though he violently resisted, when he knows that such resistance will be unavailing. Hence, if you believe from the evidence in this case that the plaintiff, even though in the right in refusing to pay the sum demanded of him, yet nevertheless invited the defendant's employés to forcibly eject him, or knowing that they would do so, and that he could not

successfully resist, yet nevertheless refused to leave the train when ordered, he cannot recover for any physical injuries he may have sustained in resisting expulsion, unless they were caused by the use of unnecessary force in expelling him. He can, however, recover damages for any physical injuries sustained by him in resisting expulsion, which were caused by the use of any unnecessary force or violence employed by the company's servants. But if you should believe from the evidence that plaintiff, for the purpose of making a case against the defendant company, and not in an honest assertion of what he thought were his legal rights, told defendant's employés to stop the train and put him off, he cannot recover, and your verdict should be for the defendant.

"If a person is wrongly expelled from a railroad train, he is entitled to recover all damages he has actually sustained; such as loss of time, labor, inconvenience and expense incident to traveling at another time, or by other modes of conveyance to the place he was endeavoring to reach, for the physical pain endured by him, and such mental suffering as grows immediately out of or resulting directly from such physical pains, provided such physical and mental pains are not the result of such force as was necessary to employ in expelling him and which he did not invite, or could have avoided by refraining from a hopeless and unreasonable resistance, and also such damages as will compensate for the sufferings of outraged and humiliated feelings, natural to a man who is compelled to submit to such an indignity in such a public place. And when a wrongful expulsion of a passenger occurs, and such expulsion is accomplished by or accompanied with acts of gross oppression, wanton disregard of the rights and feelings of the person expelled, and wanton disregard of the duties imposed upon the company, a kind of damages called exemplary may be allowed; that is, damages which the law allows for the purpose of teaching the offending party lessons of good-citizenship, respect for the rights and feelings of others, and regard for the duties resting upon him, the offending party; but in all such cases the damages should be reasonable in amount, not awarded through any passion or prejudice excited by the misconduct of the wrongdoer, but should be tempered and proportioned to the necessities of the case, the magnitude of the offense, the wrong actually endured, the lesson to be taught. Hence in this case if you believe from the evidence that plaintiff is entitled to recover at all, he should be allowed as a matter of right to compensation for

the labor, inconvenience and expense of being compelled to go to his place of destination at another time, and by other modes of conveyance, if any were resorted to, for physical pain endured by him which resulted from the force employed in expelling him, provided he did not invite the employment of such force, or unreasonably awaited its employment when he might have avoided it; and for such mental suffering as directly resulted from and grew out of such physical pain, and for such humiliation and degradation as were imposed upon him by being compelled to leave the train under imputation publicly cast upon him of having refused to pay his fare, or having violated the relations of passenger and carrier between himself and the company.

"In addition to these items of compensatory damages, the exemplary damages before spoken of may be awarded, if in the exercise of a sound judgment you believe from the evidence the case requires the same for the reasons and purposes stated.

"No rules exist for the measurement of damages awarded for physical and mental pain, or for the endurance of a humiliating expulsion from a train of cars, but such damages must nevertheless bear, so far as it is possible to discover the same, an exact relation to the injuries inflicted, and cannot be awarded as a matter of guess-work, or captiously and recklessly, but should be as near compensatory in a money point of view as is possible to estimate the same, and the distinction between such damages for such injuries and the exemplary damages before spoken of should be kept fully in mind, so as not to confound the two, or award the one for reasons which alone justify the other.

"The burden is upon plaintiff to prove his case, that is, the wrongfulness of his expulsion from the train, and the amount of his damages, by the preponderance or greater weight of the evidence; not necessarily by the greater number of witnesses, but by witnesses of greater credibility, intelligence and knowledge of the matters about which they testify. You should take into account the interest which witnesses have in the result of the controversy, and the bias and prejudice they may have, if any, against either of the parties, and if you believe from the evidence that any witness has willfully sworn falsely to any material matter, you are at liberty to disregard the whole of his testimony because of that fact.

"You are the exclusive judges of all the evidence in the case, of what it was or was not, and of the credibility of all the witnesses."

The jury returned a verdict in favor of the plaintiff, and assessed his damages at $4,000, and in answer to special questions, stated that $3,000 of the amount was allowed as punitive damages.   A motion for a new trial was made upon the grounds, among others, of misconduct of the plaintiff, excessive damages given under the influence of passion and prejudice, and that the verdict was not sustained by sufficient evidence. The court ruled that the motion for a new trial would be sustained unless the plaintiff would remit one-half of the compensatory damages, and also one-half of the punitive damages; and thereupon the plaintiff entered a *remittitur* as to one-half of the amount of the verdict—the sum of $2,000—and the court then overruled the motion for a new trial.    The railroad company excepts, and brings the case to this court for review.

*Geo. R. Peck, A. A. Hurd, Robert Dunlap*, and *J. G. Egan,* for plaintiff in error.

*Keller & Dean,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J. :  J. C. Dwelle was expelled from one of the trains of the Atchison, Topeka & Santa Fé Railroad Company on April 13, 1887, for the reason that he refused to pay the fare which the collector of the train demanded of him.   He took passage on the train at the station of Cedar Grove for the purpose of going to Florence, a distance of six miles.   He reached Cedar Grove about the time of the arrival of the train, and after the station agent had left the ticket office and gone to the forward part of the train to assist in loading the baggage that was being taken on at that station.    There was no one in the ticket office at the time from whom he could have purchased a ticket.    After boarding the train, the collector demanded his fare, when Dwelle tendered the sum of twenty cents. The collector informed him that as he had no ticket he must pay ten cents in excess of the regular fare, which was eighteen cents.    Dwelle claimed that the excess could not be collected, for the reason that there was no one in the ticket office from

whom he could purchase a ticket, but the collector insisted on the payment of the twenty-eight cents, and returned the twenty cents which Dwelle had just before given him. There is a dispute in the evidence as to what subsequently occurred. The collector claims that Dwelle insisted that he would not pay the excess, and told him to stop the train and put him off; nd the collector went forward and informed the conductor that a passenger had refused to pay his fare and he desired to him put off. Dwelle, however, claims that he endeavored to pay the excess fare before any steps were taken to stop the train. After the collector went forward for the conductor, Dwelle went toward the rear of the coach, when he met another collector and tendered to him the fare, which was at first taken, but about that time the first collector returned with the conductor of the train, and the second collector, being informed of what had previously occurred in relation to Dwelle's fare, returned the money given to him. After a parley between Dwelle and the trainmen, during which Dwelle several times tendered the full amount of twenty-eight cents as fare, he was put off the train. He violently resisted the efforts to eject him, and after being put off he climbed on another portion of the train a second time, and the trainmen were again required to use force in removing him from the train. There is testimony that so much time was taken in removing him that the train was stopped for a period of five minutes for that purpose. He claims that one of his legs was strained and injured in the struggle.

Error is assigned on the refusal of the court to instruct the jury that if the ticket office at Cedar Grove was open for the sale of tickets for thirty minutes prior to the schedule time for starting the train, and the plaintiff failed to purchase a ticket during that time, and did not tender a ticket upon the train, that he was bound to pay the excess fare; and further, that the defendant was not bound to keep open its ticket office after the schedule time for the starting of the train. Testimony was offered tending to show that the train from which Dwelle was ejected was about ten minutes behind-time when

it reached the Cedar Grove station. The court refused this instruction, and instructed the jury that before the railroad company could require the payment of excess fare from a passenger who had not purchased a ticket, it must appear that it kept its ticket office open, with an agent in the same ready upon call to sell tickets, long enough before the starting of the train to enable passengers to purchase tickets and safely board the train. The statute which authorizes a railroad company to discriminate in its rates of fare between those who purchase tickets and those who do not, contains the following proviso:

"This act shall not apply to any passenger taking passage on any railroad train (from any station) at which such railroad company fails to keep tickets for sale, or at which such company shall neglect or fail to keep its ticket office open for the sale of tickets at least thirty minutes immediately prior to the starting of such train." (Laws of 1886, ch. 139.)

It is contended that it will subject the companies to great inconvenience and hardship to require them to keep an agent at his post, not only thirty minutes before the schedule time of departure, but also during the time that trains are unavoidably delayed, as they frequently are. The statute must control; and its terms are so plain that little question can arise as to their meaning. No right to charge an excess fare is given unless the company keeps an office open for the sale of tickets immediately prior to the departure of the trains. No mention is made of the schedule time of starting the trains, nor is there anything in the language of the statute indicating that the office should only be kept open thirty minutes prior to the advertised time of the departure. The exception is expressly made to apply to any passenger taking passage on "*any railroad train*," and requires the ticket office to be open thirty minutes before the starting of *such train*, and not thirty minutes before the advertised time of starting such train. It might be that in the absence of a statute a regulation such as is con-

1. Railroad passengers—when excess fare can be lawfully collected, when not.

tended for might be deemed a reasonable one, such as the courts would enforce; and that seems to have been the holding of the courts in the cases cited by the plaintiff in error. (*Railroad Co. v. South*, 43 Ill. 176; *Swan v. Railroad Co.*, 132 Mass. 116.)   The legislature, however, has determined what a reasonable regulation is in order to found a right for the charge of excess fare, and we are therefore not called upon to determine what in our opinion would be a reasonable regulation in that respect. (*Porter v. N. Y. C. Rld. Co.*, 34 Barb. 353; *Nellis v. N. Y. C. Rld. Co.*, 30 N. Y. 505; *Chase v. N. Y. C. Rld. Co.*, 26 id. 523.)   There is a conflict in the evidence as to whether Dwelle arrived at the depot in sufficient time to have purchased a ticket and to have safely boarded the train; but if he did, and there was no opportunity for him to purchase a ticket after his arrival, the company had no right to demand more than eighteen cents from him, nor any right to eject him from the train.

Whether the tender of the excess was made by Dwelle before any steps were taken to remove him from the train, is also a disputed question by the evidence.   The court properly ruled that —

"If he refused when demanded to pay the fare he knew, or ought to have known was justly due, and persisted in such refusal until the company in the exercise of its right to expel him therefor had taken the necessary steps to put him off, as by commencing to stop the train, or seizing his person if such seizure was necessary, such plaintiff was a trespasser, and by such acts and conduct relieved the company of its obligation to carry him, and he could not reimpose such obligation on the company by making a tender of the sum due after having once refused it for the purpose and under the circumstances stated, and having put the company to the trouble of the performance of acts necessary to his safe and proper expulsion; but notwithstanding such refusal for such purpose and under such circumstances, if the plaintiff, prior to the taking of such steps by the company to expel him, tendered the proper amount to the proper employé, he was bound to accept it and permit the plaintiff to ride."

2. Tender of fare after expulsion begun—correct instruction.

Complaint is made, however, of that part of the charge immediately following the portion above given. It is as follows:

"But on the other hand, if you believe from the evidence in the case that the plaintiff refused to pay the amount demanded of him, but that such refusal was not for the purpose of defrauding the company or unjustly witholding its legal dues, or vexing, annoying, delaying or putting to inconvenience the company's employés, but was done in good faith, under a mistaken belief that he was under no legal obligations to pay all that was demanded, and such honesty of purpose and belief was apparent from the manner, temper, demeanor and conduct of plaintiff, and the circumstances of the case, the company was bound to accept the sum previously refused if tendered at any time before the actual expulsion, or after such expulsion and before the starting up of the train."

It is contended that the motive of the passenger, or whether he acted in good faith and under a mistaken belief that an unjust demand had been made of him, cannot affect the case. It is said that the person in charge of the train must, in the interest of the public as well as the company, act promptly, and should not be required to take the *ex parte* statements of the passenger in regard to whose fault it was that no ticket was purchased. It is claimed in the present case that the collector did inquire of another passenger who came upon the train at the same station, and learned from him that the office was open and that tickets could have been purchased there. It is further urged that it is unreasonable to compel a conductor to institute an investigation as to the motives of a passenger, whether he is acting in good faith and under a mistaken belief that he was tendering all the fare that could be rightfully required of him; but his proper course when the collector insisted on the payment of the excess was to pay the fare demanded, and afterward, when opportunity is given for investigation, to apply for a refund or seek redress against the company. The following cases are cited as supporting the contention: *Railroad Co. v. Nichols*, 8 Kas. 505, 519; *Railway Co. v. Rice*, 33 id. 398, 401; *Railroad Co. v. Gants*, 38 id. 608, and cases therein cited.

A majority of the court are of the opinion that that portion of the instruction which required an acceptance of a tender of the amount demanded at any time before the expulsion, or after the expulsion and before the starting of the train, where the refusal was in good faith and made under a mistaken belief that there was no legal obligation to pay the sum demanded, is erroneous. In the opinion of the writer the rule of the instruction is both reasonable and correct; and further, that the entire charge states the law aptly, fairly and fully as it arises under the facts of this case. Of course the person in charge of the train should not be required to read the mind of a passenger, nor be governed in his action by the motives of the passenger which are not manifest. As will be seen, the instruction only required the collector to accept the tender when it appeared from the "manner, temper, demeanor and conduct of the plaintiff and the circumstances of the case" that the refusal of the excess fare was not to defraud the company or withhold from it all its legal dues, nor to vex or annoy the employés, but that the passenger was honestly mistaken as to a fact, or as to what was legally due from him. No excess fare could be collected if the ticket office was not open for the purchase of tickets until the departure of the train, and an honest mistake as to this fact may be readily made by either the conductor or the passenger. If a passenger, acting in good faith, makes such a mistake, and refuses a demand for excess fare, and his honesty is apparent to the collector or conductor of the train, and if when he learns his mistake, either before or after his expulsion, he tenders all that is demanded, it is reasonable and right that his tender should be accepted, and he should be allowed to ride. No good purpose can be accomplished by denying his right to ride under such circumstances.

*3. Erroneous instruction.*

It is next urged that the verdict was excessive, and was given under passion and prejudice due to the misconduct of the prevailing party. There is good reason for this complaint. The misconduct referred to was the statement of matters not pertinent to the case, and which were calculated

to arouse the prejudice of the jury, by the counsel for the plaintiff below. In the course of the argument, it was said that the defendant railroad company is a powerful corporation, which holds its employés and servants in a vise, and requires them to go and come to the witness-stand and testify at its behoof and dictation; that railroad companies are looked upon with suspicion and prejudice, and that such prejudice is well founded. It was stated that the government gave to the railroad company ten alternate sections of land on either side of the railroad to aid in the building of its road; that that land was worth on an average to the railroad company $5 an acre, which is $3,200 for every section, and which would be $32,000 a mile that the railroad company got to assist in the building of its road. It is then stated that it is a lamentable fact that, notwithstanding all these things, the railroad company makes a studied and determined effort to bleed the people all along its line. An objection was made to the remarks of counsel, as not based on the facts, and as being an appeal to the passions of the jury, which objection was overruled. In further argument, counsel continued to inveigh against railroad companies, claiming that they controlled legislation, and that the act in relation to collection of excess fare was for the benefit of railroad companies, and was dictated by them. It was further stated that the odor around railroad offices was such as to demoralize men, and to make them disregard their solemn obligations and their duties to their fellow-men; and further, that it tended to make them disregard their solemn oaths when they come upon the witness-stand; that they are educated to throw baggage and destroy it, to throw it off the trains and tumble it in heaps; and further, that they are educated to snub passengers on every occasion, and not to give a civil answer when asked a civil question. It was stated that the employés of the company performed its bidding without regard to right or wrong, and that they go on the witness-stand to testify to whatever they are given to understand by the railroad company that they want them to testify to. It was stated that there are few men who dare to enter into litigation

with a railroad company because it has a legal department, and has lawyers hired by the year, and therefore had no care what the cost of the litigation might be. A comparison was made betweem the defendant company and another railroad company which operated a road through the town where the court was held, in which it was stated that the policy of one was to treat everybody decently, rightfully and well, while the policy of the other was different, and that the defendant should be taught a lesson by the imposition of heavy punitory damages. In speaking of witnesses who had given testimony against the plaintiff below, an allusion was made to the fact that there was a man killed down there about six years ago, and that there were some of these witnesses who would cut another man's heart out, men who would kill another man's cow, and would steal another man's rocks; and that these were the kind of men whom the railroad company had brought to assail Dwelle's reputation for truth and veracity. This line of argument was continued at considerable length. These statements were not based on the testimony, and most of them were wholly incompetent, and of a very prejudicial character. It requires no discussion to show that counsel went far beyond the scope of legitimate argument, and their course in dragging extraneous matters and facts before the jury, which manifestly tended to excite their prejudices, merits disapproval and the setting aside of the verdict, which was apparently influenced by the misconduct. (*Huckell v. McCoy*, 38 Kas. 54, and cases cited.)

In the course of the argument, counsel from the plaintiff below read from the case of *Railroad Co. v. Weaver*, 16 Kas. 462, and over the objection of the opposing party. That portion which was read contained expressions of the opinion of the writer with regard to the rule of accountability of railroad companies, and also of the conduct of the servants and employés of railroad companies toward the public. If the law of the Weaver case is pertinent and proper, it should have been presented to the jury in the charge of the court. The statement of what purports to be facts in the opinion

read to the jury was also inapplicable and should have been excluded. These facts were not introduced in evidence before the jury, nor in fact could they have been. Hearsay evidence is not admissible, whether given by a witness, stated by one of the counsel in his argument to the jury, or read from the official report of a decision made by the supreme court. All matters not in evidence and not pertinent to the issue cannot be brought before the jury upon any pretense. In the case of *The State v. Wait,* ante, p. 310, the question of the right of counsel to read to the jury from an opinion published in the Supreme Court Reports, statements with regard to facts in another case is denied, and numerous cases are cited in support of that ruling. All these matters were calculated to divert the attention of the jury from the testimony and the real issues in the case, and to prejudice them against the defendant. It is claimed, and is true, that objections were not made to all of the statements, but the attention of the court was called to the objectionable language at the beginning of the argument, and as that was overruled, the party refrained from pressing further fruitless objections. The question is fairly raised by the objection that was made and the exception that was taken, and it was the duty of the court thereafter to regulate the course of the argument and to exclude from the jury the extraneous and improper statements. *Prima facie,* these statements were prejudicial, and where it appears that they may have prejudiced the jury and led to the bringing in of the verdict that was rendered, a new trial should be granted. We are not left to determine from the statements of counsel alone, as to whether the verdict was influenced by the passion and prejudice of the jury. The court below, who watched the conduct of the trial and the effect of the argument upon the jury, has found that the verdict was excessive, and that it was probably influenced by the misconduct of the prevailing party. In passing upon the motion for a new trial, the court makes the following statement:

"My judgment is, gentlemen, and it has been since the

verdict and findings were returned, that the amount of damages awarded in this case is excessive, and, considering the argument of counsel to the jury, might have been given under the influence of passion and prejudice. Upon that point I fear that I committed error myself in allowing the address of plaintiff's counsel over the protest and objections of the counsel for the defense. It struck me throughout as being heated and inflammatory, and calculated to arouse the passion and prejudice of the jury. It struck me at the time as being a character of address that would be difficult for a jury, unless exceptionally discreet and fair-minded and strong-minded, to resist."

The court, having thus found, ordered a new trial unless the plaintiff below would remit one-half of the damages, and in pursuance of that direction the judgment was reduced from $4,000 to $2,000. We think the court should have gone further, and have granted a new trial absolutely. If the jury were influenced by passion and prejudice in rendering the verdict which the court found to be excessive to so great an extent, there was sufficient grounds for holding that the entire verdict and all the questions in the case were likewise influenced. From the testimony in the case, we agree with the judgment of the district court, that the verdict is excessive; and when it is found that a verdict so grossly excessive as this, has probably been influenced by passion and prejudice, this court will not hesitate to reverse the judgment and grant a new trial. (*Railroad Co. v. Cone*, 37 Kas. 567; *Steinbuchel v. Wright*, 43 id. 307, 23 Pac. Rep. 560; *Cassin v. Delaney*, 38 N. Y. 178.)

4. Conduct of counsel; excessive damages; new trial.

The judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.