No. 26,983.

NELLIE R. STROUP, *Appellee,* v. NORTHEAST OKLAHOMA RAILROAD COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

DAMAGES—*Verdict—Necessity of Approval by Trial Judge—Reduction or New Trial.* An opinion given by the trial court upon the overruling of a motion for a new trial—the matter in controversy being whether the verdict in a personal injury case was too large—is held not to show such an approval of the verdict as to permit a judgment thereon to stand, and a reversal for a new trial is ordered unless the plaintiff shall consent to accept a reduction to $20,000.

Appeal from Cherokee district court; FRANK W. BOSS, judge. Opinion filed February 12, 1927. Reversed, subject to consent to reduction of judgment.

*Al. F. Williams, Don H. Elleman,* both of Columbus, and *Ray McNaughton,* of Miami, Okla., for the appellant.

*Charles Stephens, Frank E. Dresia* and *Hubert Horning,* all of Columbus, for the appellee.

The opinion of the court was delivered by

MASON, J.: Nellie R. Stroup was injured in a wreck caused by a motor car of the Northeast Oklahoma Railroad Company, in which she was a passenger, running into a car ahead of it, bound in the same direction, which had come to a stop while the other car was some two or three hundred feet behind it, going twenty-five or thirty miles an hour. She brought this action against the company

Appeal and Error, 4 C. J. p. 1143 n. 8.   Judges, 33 C. J. p. 929 n. 71.   New Trial, 20 R. C. L. 315.

to recover damages. A first trial resulted in a verdict for $37,000, which was set aside by the trial court on the ground that it was excessive "to the point that it indicated passion and prejudice on the part of the jury." On a second trial a verdict was returned for $36,700. The trial court required a reduction of this to $30,000 as a condition of refusing a new trial. The remittitur was accepted by the plaintiff and judgment was rendered for that amount, from which the defendant appeals.

The case was submitted to the jury solely on the question of the amount to be allowed, no controversy being made as to the defendant's liability. She was twenty-four years old at the time of the accident. She then weighed 180 or 185 pounds. She walked home from the car line unassisted, the distance being six or eight blocks. Immediate visible injuries included a cut on her forehead and one on her lower lip, and bruises on the back of her head and on her shoulder. Following the injury she was extremely nervous, a condition that has continued. Her weight dropped to 136 pounds within a few months. A specialist in mental and nervous diseases from a later examination testified that she had a fracture of the third cervical vertebræ downward, a displacement in the other vertebræ next to it, and also a fracture of the second cervical vertebræ, and an impaction of the first and second vertebræ. He gave it as his opinion that she— .

"Will never be able to do any work or concentrate her mind on anything or amount to anything either physically or mentally, and the probabilities are from her symptoms that she is manifesting, and from what the X-ray plates show, that she will never be right mentally, probably end her days in the insane asylum, or probably she will, in a few words, develop definite paralysis and become completely paralyzed, or death may intervene in the next few years. Those are the things that we find in far the majority of the cases of similar injury; . . . that her mental and physical weakness will continue throughout her life because of the accident she has received."

There was other medical testimony in corroboration of this, and doctors called for the defendant contradicted it. One of them said:

"I did not find any fracture or break in the vertebræ. . . . I found no evidence of fracture in the vertebræ of the plaintiff. . . . I found no evidence of any impaction in the vertebræ. . . . This young lady it occurs to me is suffering with a type of hypnosis or hysterical condition as a result of suggestion. . . . I do not find anything wrong with her physically. Her mental condition of course too is a type of hypnosis or hysteria. It shouldn't be permanent. I think her condition will change materially when this lawsuit in question is settled, regardless of how it is settled, whether it is for or against her. I think the condition will immediately change. I think she will

Stroup v. Northeast Oklahoma Rld. Co.

get better, I believe she will get well. I believe that this to some degree is a hysterical and mind condition somewhat induced by outside conditions and influences."

These quotations are merely fragmentary but serve to show the. general character of the issues tried.

In an opinion given in overruling the motion for a new trial the judge said in explaining the setting aside of the first verdict:

"In the trial . . . several things occurred, one of which was that the plaintiff had been permitted to occupy a cot in the county attorney's office right across from the court room in a position in which the jury frequently at least could have seen her if they didn't see her lying on this cot and being taken care of by members of the family."

In the course of the decision granting the new trial the judge had said:

"If the jurors or any of them did see what took place in there, and I refer now to the plaintiff lying on the cot surrounded by two or three ladies attending her, I am convinced that it was improper."

In the second trial the plaintiff took the stand in her own behalf. The abstract shows these proceedings followed:

"My name is Nellie Stroup. I am the plaintiff in this action. I was on the back car when a collision occurred north of Miami on March 22, 1924. I remember getting on the other car that came out, that is the first thing that I remember. When I got down to Miami I went to my home.

"Q. What, if anything, did you experience in the matter of feeling after that collision and as you were going home and when you got home, etc., that evening? Take it along in the evening after you got home, what did you experience that was unusual to you? A. Well—

"Q. Did you have any pain? Did you have any pain, Miss Nellie? You must try and contain yourself now. Just state to the jury. Try and contain yourself. We want your testimony.

"By the court: Let the record show that at this time the witness, after having been asked the last question, began crying and manifested an apparent nervousness on the stand and this condition continued for a period of a minute or two and it was then requested by both sides that we take a brief recess, which was done. Let the record show further that as the jury was leaving the room the witness was assisted down from the witness chair by her mother and one of the attorneys for plaintiff."

After an interval of about an hour and a quarter the defendant returned to the stand. Her attorney asked no further questions. A brief cross-examination followed, during which the plaintiff "manifested one of her nervous spells." The cross-examination was stopped "for a moment or so, when she seemed to quiet herself again," and then proceeded. A very brief redirect examination was

followed by a still shorter recross-examination. "Just as this was being completed she again manifested another one of her spells and two members of her family carried her from the witness stand practically to the door of the court room and then sat her down on her feet and opened the door and they assisted her out of the door. This was in the presence of the jury."

The defendant argues that a new trial should have been granted and that a reversal should now be ordered because the proceedings just related necessarily made such an impression on the jury as to bring about a verdict based upon sympathy for the defendant rather than upon the evidence. This argument is supplemented by the contention that inasmuch as the first verdict, for $37,000, was set aside as so excessive as to show passion and prejudice, consistency requires like action with respect to the second verdict, which was for only $300 less. The trial court was in a better position than we are to form a judgment as to the character and cause of the episode referred to and as to its probable effect on the jury. And we cannot be certain that the evidence at the second trial may not have been so different from that at the first as to justify a different conclusion concerning the amount of damages that should be awarded. Therefore these two matters in themselves afford no basis for a reversal. They are, however, of importance when considered in connection with the defendant's principal contention, which is that a new trial should be ordered because the verdict was too large, and especially because it had not received the kind of approval by the trial judge which the statute contemplates.

The "spells" of the plaintiff while upon the witness stand, and the assistance given her in leaving it, would obviously make an appeal to the sympathy of the jurors difficult for them to resist unless they were "exceptionally discreet and fair-minded and strong-minded," as has been said with reference to the probable effect of inflammatory language used in the argument of counsel. (*A. T. & S. F. Rld. Co. v. Dwelle*, 44 Kan. 394, 24 Pac. 500.) Conduct of this kind could not properly be exhibited to the jury as a demonstration of her condition, and its inadvertent exhibition before them ought not to be allowed to influence their verdict. The trial judge would be regarded as having held, upon better information than is available here, that it did not increase the amount awarded to the plaintiff, if he had given an unequivocal approval to the verdict. Such approval as he gave, however, was qualified by considerations

shown by these excerpts from his opinion in overruling the motion for a new trial:

"We have now had two trials . . . and the jury in each instance has reached substantially the same conclusion. I still think that the verdict is too high—at the same time to say that the verdict is not supported by the evidence is going pretty strong. We must look at this from both points of view. I will say frankly that if I had been a member of the jury I would not have returned a verdict for an amount as large as this. At the same time, after hearing the testimony twice and observing the apparent condition of the plaintiff I would have voted to return a verdict for a very substantial sum. Just what amount should be allowed in cases of this kind is difficult to say. The evidence showed that the plaintiff was a young woman earning approximately $900 a year, and the evidence further shows and the condition of the plaintiff shows that she is undoubtedly in a deplorable condition at this time. Whether that condition will be permanent or not, as I said a moment ago, was the chief question before the jury. Two juries have apparently decided that they would take the plaintiff's version of it. If the plaintiff 'is permanently injured and that injury will remain substantially as it is now neither $36,000 or $36,000,000 would pay her back for the injury she has sustained. There can be no question about that. In other words, what I mean is, it is sometimes argued to juries—what would you take to have your wife or your daughter placed in the condition in which this person is now? Of course, nobody would take any sum. . . . 'Of course, in this case the plaintiff was not earning a great amount of money—$900 a year. The interest on $36,700 alone would pay her considerably more than she was able to earn, and she would always have the principal.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"The supreme court of this state has said that a verdict must be approved by the trial court. In at least one case they say that the trial judge sits as the thirteenth juror and the verdict must be his verdict. I haven't been able to understand that or, if I do understand it, then I don't understand the value of a jury trial. I don't understand what a jury trial means. If the verdict must be his verdict in other words, if the amount were too large or too small it must be the same amount that he would render if sitting on the jury, then what is the use of having a jury at all? I cannot see it. I dont believe that is what the court means. I believe that the court simply means that the verdict must be, in the opinion of the trial judge, well supported by the testimony in the case and by reason.

"Now, I will say that this amount that I have offered to approve, $30,000, I want to say this and I want it in the record, and then the supreme court can do what they want to with it, but I think it is fair to the defendant that this be put in. If I were sitting on the jury as one of the jurors I would not have voted for that much. As said awhile ago I would have voted for a very substantial amount, but I think it would have been something less than $30,-000. On the other hand, I think the evidence in the case fully and abundantly sustains and supports a verdict for this amount. That is, of course, I mean the evidence of the plaintiff which apparently the jury has accepted, and I

cannot say that a verdict for $30,000 would be so unreasonable that it should be set aside, therefore, I am saying that if the plaintiff will remit all in excess of $30,000, I will approve that amount and render judgment accordingly, otherwise, a new trial will be granted."

It is doubtless true, as stated, that no one would voluntarily undergo the plaintiff's injuries, if they are permanent, for $36,000,-000 or any other sum. But that is not a consideration to be taken into account in assessing her damages. The law does not undertake to compel compensation on that basis. If it did there would be no limit to the amount that could be exacted. The case is not based upon a claim of intentional wrong doing, and exemplary damages were not given or asked.

As suggested, this court has in a number of instances referred to the trial judge as a thirteenth juror. For illustration: "The saying that it takes thirteen to render a verdict has passed to an adage, but can mean nothing more than that, in cases where conflicting evidence raises a substantial and serious doubt in the mind of the trial judge of the correctness of the conclusion reached by the jury, he may interfere." (*Sovereign Camp v. Thiebaud*, 65 Kan. 332, 337, 69 Pac. 348.) "This was peculiarly the sort of a case where the trial judge was bound to exercise to the fullest extent his judicial prerogative as the thirteenth juror." (*Vidich v. Benefit Association*, 108 Kan. 546, 550, 196 Pac. 242.) "The reasons back of the policy of having the judge, in the familiar phrase, act as the thirteenth juror, apply in subsequent trials as well as in the first." (*Davis v. Central States Fire Ins. Co.*, 121 Kan. 69, 71, 245 Pac. 1062.) This language is attributed to Dean Wigmore: "To save justice from the consequences of using untrained jurors, there must be judicial control. The judge must be the thirteenth juror. If this feature is gone, jury trial becomes, as at Athens [when Socrates was tried], merely a system of mob justice." (13 American Bar Association Journal, 51.) In a criminal case this court has said: "On appeal, it is of no consequence that before the jury rendered its verdict the trial court expressed serious doubt as to the sufficiency of the evidence to establish the defendant's guilt; although if such doubt had persisted in the trial court's mind after the verdict was rendered it would have been its duty to set the verdict aside and grant a new trial." (*State v. Frey*, 111 Kan. 798, syl. ¶ 4, 208 Pac. 574.)

Stroup v. Northeast Oklahoma Rld. Co.

In an often-cited case the trial judge made this statement in over-ruling a motion for a new trial:

"I cannot say that the verdict of the jury in this case is not a fair average of the various estimates of damages stated by the witnesses; but it is an average, and seems to take no account of any differences in the ability of the several witnesses to judge of the matter. . . .

"The verdict in this case does not meet the approval of my judgment. It is, in my opinion, largely in excess of what would be full compensation to the owner of the land; but because, and only because, a jury in a former trial of this case gave a verdict but slightly larger than that now under considera-tion, and which I set aside as excessive, I let this one stand. There must be an end to the litigation some time, and inasmuch as twenty-four men have substantially agreed upon a rate of compensation, though greatly in excess of what my judgment can approve, it is possibly fair and proper that I should stand out of the way to a final determination of the controversy." (*K. C., W. & N. W. Rld. Co. v. Ryan,* 49 Kan. 1, 3, 4, 30 Pac. 108.)

In reversing the decision this court said:

"It has been the unvarying decision of this court to permit no verdict to stand unless both the jury and the court trying the cause could, within the rules prescribed, approve the same. When the judgment of the trial judge tells him the verdict is wrong, whether from mistake, or prejudice, or other cause, no duty is more imperative than that of setting it aside and remanding the question at issue to another jury. While the case is before the jury for their consideration, the jury are the exclusive judges of all questions of fact; but when the matter comes before the court upon a motion for a new trial, it then becomes the duty of the trial judge to determine whether the verdict is erroneous. He must be controlled by his own judgment, and not by that of the jury." (p. 12.)

Whatever difference of opinion there may be concerning the proper terms in which to describe the duty of the trial judge in his capacity as what is sometimes called the thirteenth juror, this much is clear—if he is to let the verdict stand he must approve it upon his own judgment and not upon that of the jurors. This does not mean that the decision of the jury is not to weigh with him in mak-ing up his mind, but the final decision must be his and not merely the acceptance of theirs. We do not regard the language of the trial judge in this case as showing such an approval. It is at most equivocal and doubtful. The tests it proposes of the conditions per-mitting an approval of a verdict are insufficient: that it is "well supported by the testimony in the case and by reason"; and that "the evidence in the case fully and abundantly sustains and sup-ports" the verdict. These seem but little different from the test of

what is necessary to the sustaining of a verdict in an appellate court—that there shall be substantial evidence to support it.

"Where a motion for a new trial is filed on the ground that the verdict and findings are contrary to the evidence, and the trial judge in overruling the motion makes a statement from which this court is doubtful whether he intended to give his approval to the verdict, or overruled the motion and rendered judgment on the verdict and findings because they were sustained by some positive evidence, *held,* the judgment should be reversed and the cause remanded with directions that a new trial be granted, unless the trial· judge shall make a finding that he approves the verdict, and in case the verdict is approved, the judgment will be affirmed." (*Butler v. Milner,* 101 Kan. 264, syl., 166 Pac. 478.)

In the present case the alternative of giving the trial judge the opportunity of making his finding more definite is not available, for since the trial he has retired from the bench. Inasmuch, however, as the only issue involved is the amount to be awarded, an option will be given the plaintiff to accept a reduction of the judgment to $20,000 with interest from the date of its original rendition, in lieu of a new trial.

If before a mandate is issued hereon the plaintiff shall file in this court a consent to such reduction the judgment will be modified accordingly. Otherwise it will be set aside and a new trial granted