No. 31,143

JOHN C. WARD, *Appellant*, v. CHARLES GRANT and THE WESTERN CASUALTY & SURETY COMPANY, *Appellees*.

(26 P. 2d 279.)

Opinion filed November 11, 1933.

*Payne H. Ratner,* of Parsons, and *Harold Medill,* of Independence, for the appellant.

*B. Hudson* and *Douglas Hudson,* both of Fort Scott, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an action to recover for personal injuries sustained in an automobile casualty. The jury answered special questions and returned a general verdict for plaintiff. No judgment was rendered on the verdict. Each of the defendants filed three motions: (1) To set aside the answers to each (except one) of the special questions, on the ground that they were not supported by evidence; (2) for judgment on the answers to the special questions, and on the entire evidence, notwithstanding the general verdict; and (3) for a new trial. These motions were heard by the court and taken under advisement, and on a later date, within the next term of court, they were decided by the court. The motions to set aside answers to special questions were sustained in part and overruled in part. The motions for judgment for defendants notwithstanding the general verdict were sustained and judgment rendered for defendants. The motions for a new trial were overruled "because the disapproval of the verdict by the court as evidenced by the entry of judgment notwithstanding the general verdict leaves nothing upon which the motions for new trial can operate." Plaintiff has appealed from the ruling of the court sustaining the motions for judgment for defendants notwithstanding the general verdict, and from the judgment against him. Defendants have filed a cross appeal from the order of the court overruling the motion for a new trial, which, of course, they desire to have considered and passed upon in the event this court is of the opinion that the trial court

erred in sustaining their motions for judgment notwithstanding the general verdict.

There is much controversy over some of the facts, but perhaps this much may be stated with certainty: Plaintiff and his wife live at Fort Scott. On May 8, 1930, shortly after noon, they started to drive to Kansas City in their almost new sport model Nash automobile. They went to Nevada, then past Rich Hill toward Butler, Mo., on U. S. highway No. 71. This is a well-improved highway having a cement pavement eighteen feet wide, with dirt shoulders seven feet wide on each side, and is much traveled. The casualty occurred on this highway about three miles south of Butler about three o'clock in the afternoon on a clear day. The highway at that point was slightly upgrade to the north for a short distance and then a steeper upgrade for about 900 feet to the top of a hill, where the road was practically level for 400 or 500 feet, then downgrade to the north. A short distance in front of the car in which plaintiff and his wife were riding was a wagon and team being driven north by a Mr. Pahlman. The wagon was on the pavement, but near the east edge thereof. North of this wagon there was a car coming from the north, driven by a Mr. Wiser, on the pavement near the west side thereof. The defendant, Grant, employed by the defendant, The Western Casualty & Surety Company, came south on the highway over the hill from the north, overtook the Wiser car, turned to the east side of the highway, drove around the Wiser car, turned back to the west side of the highway and drove past the Pahlman team and wagon, and soon thereafter his car collided with that in which plaintiff and his wife were riding. The front portion of the Grant car—perhaps more of the force on the left of the front—collided with the front part of the car in which plaintiff and his wife were riding, striking it a little to the right of the center of the front part of the radiator, but with more of the force of it at the left part of the front of the car, at such an angle that it appeared to come from the right of directly in front, driving parts of the radiator, lamp and left fender of plaintiff's car back and some of those parts against a spare tire carried in the left fender, pushing it back against the left door of the car. When the cars came to rest after the collision Mrs. Ward was lying on the ground near the west edge of the pavement, Mr. Ward was on the ground near the east edge of the pavement, plaintiff's car was standing on the pavement headed in a northeasterly direction, the

left rear wheel being about two feet west of the center of the pavement and the left front wheel about two feet to the right of the center. Grant's car was in the ditch on the west side of the pavement at a point south of the place of collision and had caught on fire. Grant appears not to have been injured, but both Mr. Ward and his wife were injured. This action involves the injuries to Mr. Ward.

In addition to the above there was evidence on behalf of plaintiff tending to show the following facts: That Mr. Ward was driving the car. Both Mr. and Mrs. Ward testified as to that, also a witness, driving a car passed by the Ward car shortly before the collision, testified that Ward was driving. Perhaps there was other evidence on the point. That as he approached the place where the collision took place he saw, when some little distance back, the wagon and team driven by Mr. Pahlman. He also noticed a number of cars coming, one after the other, down the grade from the north, perhaps five or six cars, the rear one of which was the Wiser car. Some of these were passing the Pahlman wagon as he approached it, for which reason he could not turn out to go around the wagon. He therefore slowed down to a speed of four or five miles an hour, but little faster than the team ahead of him was traveling. The string of cars approaching from the north had all passed the wagon except the Wiser car, which was perhaps 150 feet north of the Pahlman wagon, and plaintiff expected to continue to drive slowly until the Wiser car passed the Pahlman wagon. About that time he saw the defendant Grant coming over the top of the grade north of him, driving rapidly. There was evidence that about the time he reached this grade, or a little before, he passed a car which was traveling about sixty miles per hour. He also overtook and passed a car driven by a Mr. Campbell. He soon overtook and passed the Wiser car, swinging quickly to the east, then back to the west to pass the Pahlman wagon, and in doing so swung so far to the west that his wheels kicked up dust on the shoulder at the side of the pavement; that as he passed the Wiser car and the Pahlman wagon he was going very rapidly, perhaps sixty miles per hour, and his car was weaving; that as he passed the Pahlman wagon he swung to the left in behind it and was getting back toward his right to the west side of the road when the collision occurred; that the Ward car then was about sixty feet south of the Pahlman wagon; that the force of the collision tended to spin plaintiff's car around, throwing

Mrs. Ward out of the right-hand door of the car near the west side of the pavement, and about the time it came to a stop throwing Mr. Ward out near the east side of the pavement, and Grant's car then angled off toward the right into the ditch, 110 feet south of the point of collision.

The testimony on behalf of defendants tended to show that at no time was Grant driving faster than 40 miles per hour; that he did not see or pass any car he was said to have passed which was going 60 miles per hour; that shortly before he reached the top of the grade he had passed Mr. Campbell, who was driving a car loaded with flour; that he passed Wiser soon after he started down the grade from the north, but after doing so he got his car back on the west side of the road at a point as much as 300 feet north of the Pahlman wagon, and was driving straight, his car not weaving, along the west side of the pavement; that when he got almost even with the Pahlman team plaintiff, whose car was directly behind the Pahlman wagon, turned to the left to go around the wagon; that in an effort to avoid striking plaintiff's car he pulled to his right until both his right wheels were off the pavement, and while in that position he was struck by plaintiff's car, and that the effect of the collision was to push plaintiff's car back a little and angling on the slab facing northeast, and that his own car went into the ditch about 30 feet from the point of collision. Witnesses called by defendant testified that Mrs. Ward, plaintiff's wife, was driving, but it developed that they reasoned that to be true from the fact that Mrs. Ward was lying on the west side of the pavement and Mr. Ward on the east, their theory being that Mrs. Ward had fallen out of the left door of the car and Mr. Ward out of the right door.

The evidence further tended to show that Mr. Grant was an employee of the Western Casualty & Surety Company, which had its principal offices in the insurance building at Fort Scott, where Mr. Grant had a desk and a stenographer and bookkeeper to help him with his work. The company also had a department office in Chicago, where Mr. Grant had a desk. His position with the company carried the title "assistant secretary in charge of the liability and burglary department." He did field work as well as office work. He was paid a monthly salary, which was credited each month to his account in a bank. In addition to that he was paid his expenses when in the field. These he kept track of daily on slips provided for that purpose, which he turned in to his company each week

and received payment. On the day of the casualty he was on his way from Chicago to Fort Scott, where there was company business awaiting him. On the trip he had visited Rock Island, Ill., and Iowa City and Marshalltown, Iowa, at which latter point he had sent a telegram to the president of the company at Fort Scott advising of his whereabouts, the towns he expected to visit and when he would be at Fort Scott. He then went to Des Moines, Iowa, where he transacted business on behalf of the company, and from there to Kansas City, which he reached on the evening of May 7. He stayed there all night at the hotel where he usually stopped, and the next morning, the day of the casualty, left Kansas City for Fort Scott, driving by way of Butler, Mo., where the company had an agency in charge of a Mr. Van Dyke. Soon after the casualty Mr. Grant returned to Butler, Mo. Later the same day a Mr. Hill, who is a clerk in the company's claim department at Fort Scott, and Mr. Tonnies, assistant secretary of defendant at Fort Scott, went to Butler, Mo., and in company with Mr. Van Dyke called at the home of Mr. Wiser, who was a witness to the casualty, and took from him a statement which, together with his deposition later taken, was used to impeach or weaken the force of Mr. Wiser's testimony at the trial. At the time of the casualty Mr. Grant had in the car with him a traveling bag and a brief case. The court sustained defendant's objection to a question designed to elicit information with regard to the contents of the brief case. The company paid Mr. Grant not only his salary for the month of May but his expense account, including the expenses of the trip with his car on the day of the casualty. On behalf of defendant there was evidence tending to show that the car driven by Grant belonged to him and was kept at Chicago ordinarily, and that he was driving it to Fort Scott with the view of taking his family on a vacation trip. As tending somewhat to refute this, the car bore a Kansas license. On behalf of defendant, also, there was evidence that when Grant was employed by the company, or perhaps when he was given this particular work about a year before the casualty, he was instructed to travel by train in making his trips and not to use an automobile, and that the company, or its officials, did not know that he had violated those instructions. From several of the daily expense slips turned into the company by Grant it was not easy to tell whether he had used a train or an automobile. The expense statement for the day of the casualty, however, was paid by the company after

its principal officers knew of the casualty and that he had traveled by automobile. Perhaps there were other items of evidence dealing with this phase of the case, but we shall not take space to enumerate them.

The jury answered special questions as follows:

"1. Was the defendant, Charles Grant, operating his automobile at the time of the collision without the knowledge, consent or authority of the management of The Western Casualty & Surety Co.? A. No.

"2. Did Ray B. Duboc, president, and E. C. Gordon, secretary, respectively, of The Western Casualty & Surety Company, prior to the time of the collision, disapprove the use by Charles Grant of his car in the transaction of business for and on behalf of the company? A. No.

"3. At the time of the collision, was the defendant, Charles Grant, bringing his automobile from Chicago to Fort Scott, Kan., for his own personal convenience and benefit and the convenience and benefit of his wife? A. No.

"4. If you find in favor of the plaintiff, state upon what ground or grounds of negligence you so find. A. Excessive speed.

"5. Did the defendant, Charles Grant, drive his car from Chicago to the point of collision at his own volition and contrary to the instructions of the president and secretary of the Western Casualty & Surety Company that he should use the railroad for his transportation? A. No.

"6. Was the Nash car of the plaintiff driven into the line of travel from the north, on the west half of the pavement at a time when the defendant, Grant, was passing or about to pass the wagon which was proceeding north on the east half of the pavement? A. No.

"7. What portion, if any, of the plaintiff's car remained west of the center line of the pavement after it came to rest after the collision? A. One-fourth of car.

"8. Did the plaintiff's observing of the sign to the side of the road at about the point of the collision contribute to the occurrence of the collision? A. No.

"9. Had the defendant Grant been continuing in a straight south direction on the west half of the concrete roadway for a distance of several hundred feet immediately north of the wagon? A. No.

"10. If you answer question No. 9 in the negative, state for what distance, if any, defendant proceeded in a straight south direction on the west half of the concrete roadway immediately north of the wagon. A. None.

"11. Was the defendant's automobile, at all times after it passed the heads of the horses to the point of the collision, west of the center black line of the pavement? A. No.

"12. If you find in favor of plaintiff, state if you allow him anything for fracture to the bone of his right leg. A. No.

"13. Did the Nash automobile in which plaintiff was riding collide with defendant Grant's automobile at such an angle that the impact against plaintiff's car was greater against the right front side of plaintiff's Nash car than against the left front side of said Nash car? A. No."

The plaintiff-appellant first argues that the trial court had no jurisdiction to pass on the motions to set aside answers to special questions and for judgment for defendants after the term of court at which the trial was had. On this point *J. B. Colt Co. v. Clark*, 125 Kan. 722, 724, 266 Pac. 41, and allied cases, are cited. These cases hold that the judgment of the court is deemed to be within its breast during the existence of the term at which it was rendered, and that the court may, for good cause, at any time during that term, modify or vacate it, but after the close of the term the court has no jurisdiction to alter the judgment except by procedure set forth in the statute. The difficulty of applying that principle to this case is that no judgment was rendered on the verdict of the jury at the term of court the verdict was received. More than that, the motions filed by defendants were presented to the court and argued and specifically taken under advisement. This was tantamount to an order specifically continuing the further consideration of the motions and their determination to such time as the court was able to dispose of them, even though that time be at a later term of court. Instead of having a judgment which could not be modified by the court after the term at which it was rendered, unless statutory proceedings were followed, the court had an unfinished trial pending, which had been specifically continued by the order taking the motions under advisement.

The court sustained the motions to set aside answers to questions 1, 2, 3, 5, 6 and 13, and overruled them as to questions 4, 8, 9, 10, 11 and 12. As to the answers to special questions 1, 2, 3, 5 and 6 the trial court took the view there was no evidence to sustain them. In this the court erred. Without restating the evidence, we think it ample to sustain the answers. In a written opinion, filed at the time of the decision, it appears the court was moved largely by the testimony upon defendants' behalf to the effect that Grant had been given specific instructions by the officials of the defendant company to travel by rail and not by automobile. It was for the jury to say what credence, if any, should be given to that testimony. Aside from that, the defendant company paid Grant's expense bills for the day of the casualty after its officers knew his expense item for transportation was by automobile and not by rail. A jury might well conclude that if Grant had been given instructions to travel by rail only, such instructions had been modified or waived and his traveling by automobile had been ratified.

From the opinion filed by the trial court it appears the court sustained the motions to set aside the answer to question No. 13 and the motions on behalf of defendants for judgment after an analysis and weighing of the evidence as to how the collision occurred. The plaintiff-appellant complains of this and contends that in doing so the court usurped the functions of the jury with respect to the weight to be given to evidence and the credibility of witnesses. The point is well taken. In an action triable to a jury, under our constitution and statutes, it is the function of the jury to pass upon the credibility of witnesses and the weight to be given the evidence. It is the function of the court to approve or to disapprove the verdict of the jury. Naturally in doing so the court must weigh the evidence and pass on the credibility of witnesses, but it is done with the view of determining whether the verdict of the jury shall be approved. Having considered and weighed the evidence and passed on the credibility of witnesses, if the court conscientiously can approve the verdict of the jury, that should be done. If it cannot do so, the verdict should be set aside and a new trial granted. In actions where the parties are entitled to a jury trial as a matter of right, the court is not authorized to take the case away from the jury and decide the same in accordance with its own views respecting the credibility of witnesses and the weight to be given to the evidence. To permit that to be done would be to deny the parties the right to a trial by jury. It is sometimes said the court sits as the thirteenth juror in cases of this character. Such a statement taken literally is inaccurate. The court does not sit as a juror at all. The statement has merit, if used in a figurative sense, when designed to bring out the fact that the court should not sit as an automaton and approve any verdict returned by the jury. (*Stroup v. Northeast Oklahoma Rld. Co.*, 122 Kan. 587, 592, 253 Pac. 242.) With respect to the verdict, the court has a duty to perform independent of the jury, namely, the approval or disapproval of the verdict. In determining what should be done in that respect the court should consider the evidence much as the jury is required to consider it; that is, pass upon the credibility of witnesses and the weight to be given to the evidence and give consideration to the fact that twelve jurors have returned a certain verdict. But that is done, not for the purpose of reaching a verdict, but for the purpose of determining whether the verdict should be approved. If the

action were one which under the law is triable to the court, and a jury is called in an advisory capacity only, it is within the province of the court to ignore or to set aside the special or general verdicts of a jury and make findings and render judgment in opposition to them (*Maddy v. Hock*, 134 Kan. 15, 4 P. 2d 408); but we have no such situation here. Even in a case in which the parties are entitled to a jury trial as a matter of right, if the evidence when construed as favorably to plaintiff as reasonably can be done will not support a judgment in his favor, under the rules of law applicable thereto it is the function and duty of the court to sustain a demurrer to the evidence or to sustain defendant's motion for judgment; but we do not have that situation here. In this case there is competent evidence, substantial in amount, which if construed favorably to plaintiff would sustain a judgment for him. It was error in this case for the court to set aside the verdict and the special findings of the jury and upon the evidence render a judgment for defendants.

Passing now to the cross appeal of defendants. The trial court made it clear, both in rendering judgment for defendants and in passing on the motion for a new trial, that it disapproved the verdict of the jury. In such a case a new trial should have been granted.

The judgment of the court below is reversed with directions to grant a new trial.

HUTCHISON, J., not sitting.