No. 35,026

HERBERT WALKER, *Appellant,* v. COLGATE-PALMOLIVE-PEET COMPANY, *Appellee.*

(139 P. 2d 157)

Opinion filed June 14, 1943.

*A. J. Herrod,* of Kansas City, argued the cause, and *Joseph Cohen,* of Kansas City, was on the briefs for the appellant.

*Edwin S. McAnany,* of Kansas City, argued the cause, and *Thos. M. Van Cleave, Willard L. Phillips, Bernhard W. Alden, Patrick B. McAnany* and *Thos. M. Van Cleave, Jr.,* all of Kansas City, were on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for damages for personal injuries in which plaintiff alleged that while in defendant's employ he contracted asthma, an occupational disease, as a result of negligence of defendant. The jury answered special questions and returned a verdict for plaintiff for $3,000. Defendant moved to set aside most of the special questions. This motion was sustained in part and overruled in part. Defendant also moved for judgment in its favor on the answers to the special questions notwithstanding the general verdict. This motion was sustained. Plaintiff has appealed from the adverse rulings on both motions.

The action was filed May 13, 1938. The pleadings may be summarized as follows: Plaintiff, in his petition as amended, alleged that defendant is a manufacturer of soap, has a large manufacturing plant, with many buildings and numerous departments, among which are what is known as the Sea Foam, fatty-acid, caustic soda, soap chip and soap drying departments; that from March, 1934, to May 6, 1938, he was in the employ of defendant as a carpenter and millwright, it being his duty to make repairs to various parts of defendant's buildings, machinery and equipment, and was compelled to be in or about each of the departments at various times; that in or about the departments defendant used various pieces of equipment in the manufacture of soap, and during all the time plaintiff worked in said departments there was a large amount of dust from soap, fumes from caustic soda, lye and other soap ingredients, the nature of which was unknown to plaintiff, which gave off large quantities of poisonous dust, fumes, vapor and gases; that by reason of his employment he was compelled to and did breathe large quantities of lye, caustic soda, soap dust and other poisonous chemicals and dust used in the manufacture of soap; that these harmful ingredients

also came in contact with parts of his body, with injurious effects, and were carried throughout his body, causing poisoning, asthma and chronic bronchitis, and that he had no knowledge of the dangerous character of the dust, fumes, gases and chemicals, or the effect they would have upon his health, until he was poisoned and injured, which results are more particularly described. He alleged defendant was negligent (a) in failing to provide plaintiff with a reasonably safe place in which to work; (b) in ordering plaintiff to work in departments of the plant under conditions which defendant knew, or by the exercise of due care should have known, would endanger plaintiff's life and health; (c) in failing to cause the poisonous dust, fumes, gases and chemicals to be carried away by mechanical devices, artificial and natural ventilation; (d) in failing to provide him with an adequate mask or respirator or other device for the prevention of such industrial or occupational diseases as were incident to such work; (e) in failing to keep the floors, walls, ceiling, posts, equipment, machinery and the air in the rooms free from dust; (f) in failing to post notices in the plant or departments of the dangerous character of the poisonous fumes, gases, dust and chemicals, together with advice as to the best means of preventing injury therefrom; (g) in failing to have plaintiff examined by a physician at proper intervals to ascertain if he was being affected with disease or illness incident to his work; (h) in assuring plaintiff there was no danger to him in working in the various departments and breathing the poisonous dust, fumes, gases and chemicals, which assurance of safety plaintiff relied upon.

Defendant's answer contained a general denial and pleaded facts on which it based the defense of assumption of risk; alleged negligence of plaintiff which caused or contributed to his injury; alleged it was not guilty of any of the acts of negligence and other grievances alleged in plaintiff's amended petition at any time within two years before the commencement of this action, and pleaded the statute of limitations. The reply was a general denial.

The trial by jury began May 15, 1939, and consumed ten days. The testimony of witnesses called on plaintiff's behalf may be summarized from the abstract as follows:

*W. J. Reese*, defendant's technical adviser and former chief chemist, produced an analysis of soap scrapings and testified from defendant's formula book respecting the chemical contents of different kinds of soap:

"Soap is a chemical substance which is the result of a reaction of fats and alkali. Caustic soda plus fat will produce soap and glycerine. . . . The kettle base, which is the base for all soap, has 6.5 per cent of alkali (caustic soda). Soda ash is used at the defendant's plant but there is none in the kettle base. Soda ash and alkali are used in making soap powders."

Soap is less corrosive than water and is widely used in medical practice as an antidote for poison, for enemas, etc.

"When soap is mixed with water the fatty acids and the alkalis that were used to make up the soap but which in the soap itself had lost their identity as acids and alkalis are released into their free state and again assume the attributes of alkalis and acids."

Every kind of soap made by defendant contains 6.5 percent of caustic soda.

*Harry Vance* worked in defendant's plant from 1935 to 1938, was a member of the union and its president in 1937. The union had a safety committee and he went to each department to investigate working conditions. In 1937 he talked with defendant's superintendent, McVey, and Mr. Reese. McVey said:

"Confidentially, I am going to have to get rid of Walker, he has got to the place where he is no longer any good to the company because of his asthmatic condition."

Defendant's custom was to pay more than the regular wage to persons working in dusty departments. About the Palmolive dryer there was very little dust when it was running because the dust fans took most of the dust away, but when it was closed down and men were working there it was very dusty. In the Twitchell (fatty acid) department there was practically no dust, but at times were fumes. Before a dust collector was installed in the Palmolive Tex department one could hardly see an operator ten feet away. In 1937 the safety committee made complaints to the management about the dust collectors in several departments and suggested the installation of more dust collectors. The company installed two, but these were only 35 percent efficient. The dust was particularly thick in the Sea Foam dryer room, kettle house, Super Suds and Crystal White departments. The witness had colds nearly all winter when he worked there. The conditions were the same from 1934 to 1937 in all departments. After dust collectors were installed it was a little better, but the soap dust irritated the nose and throat. Defendant did not furnish respirators to mechanics and he never saw but two, and these were in the Sea Foam department. Most of the employees working in dusty departments tied rags or handkerchiefs over their noses and mouths.

*Mary Whipple* worked in the Crystal White department from 1928 to 1930 and was compelled to quit. She again worked from 1932 to 1935 in the Sea Foam laundry soap, soap chip and other departments. The soap chip department was very dusty all the time. It was just like a fog. Many times one could hardly get his breath. The dust made her cough and sneeze and she got sick and had to quit. She was bothered at night from her throat and lungs being choked up. Nearly all employees in the departments sneezed and coughed while working. She went frequently to the plant nurse, who sent her to Dr. J. A. Fulton, who told her to stay away from there. She never saw any respirators. She used a handkerchief, and other employees in the dusty departments wore handkerchiefs over their faces. The effect on her was that it made her eyes water and her nose, throat and lungs get sore; made her cough and spit up yellow phlegm; made her lungs tight and made her sneeze.

*Delmar Dobson* worked in the framing department from 1931 to 1936. He saw one respirator in that department where there were thirty-one employees. The soap dust would irritate his throat and lungs if he was there for a long time, and the effect would last for about an hour after he quit work, causing him to sneeze and cough. The men used handkerchiefs. He preferred a handkerchief to a respirator. He has had no trouble with his throat or lungs since he left there.

*Robert Morgan* worked for defendant four years, off and on, the last time in 1937; in the Sea Foam department about a year and a half and in other departments. In the Sea Foam department the dust was so thick you could not see two feet away. It burned his eyes, made him cough and sneeze; he had difficulty in breathing, especially at night; seemed to be stopped up in his nostrils. Since leaving there he has had no nose irritation. He saw no respirators in the Sea Foam department and there were no fans. The machinery would throw dust in the air. Conditions were not the same in all departments. The laundry floor was not so dusty. The dust there made him sneeze, but didn't hurt him so much.

*Herbert Taylor* worked in several departments from 1934 to 1937, part of the time in the kettle department and part in the framing department. When sweeping the dust would be so bad he would put on a handkerchief. They swept every day in the framing department and screened the sweepings. It looked pretty foggy with dust when they were screening. He never saw any respirators in

the kettle department nor any ventilating fans. After he left the plant at night and got out in the fresh air he would feel much better. In some of the departments the dust was like fog.

*William Miller* worked for defendant in 1934, about five months in the yellow and white soap and framing department. The dust would rise from the machinery, he would inhale the dust and it would make him cough, sneeze and cry and choke up. While working there he would cough and strangle and almost vomit. No respirators were furnished employees where he worked and no dust masks. There were no notices posted in any department warning the employees about the dust. The irritation hurt his throat and chest; would draw his chest together and make his throat dry. When coughing he would spit up yellow phlegm. He would not take an inside job in that plant. Since leaving there he has worked every day.

*Steve Geer* worked in defendant's plant about three months in the winter of 1937 and was compelled to quit because the soap dust irritated his throat and lungs. He worked in the toilet soap boiling room, Super Suds and Sea Foam departments. The dust was particularly thick in the Super Suds and Sea Foam departments and on many occasions would be so thick you could not see ten feet away. It made him cough, made his chest sore, caused him to choke and spit, and he could not sleep because of headaches and coughing. There were no fans in the Sea Foam and Super Suds departments. The ventilation was bad. He saw other people cough and sneeze. Most of the girls and some of the men used handkerchiefs over their faces. He finally asked the superintendent to transfer him to some other department which was not so dusty. He did not do it and the witness quit.

*Robert Larkin* worked in defendant's plant from 1932 to 1936 in the powder, toilet soap, laundry soap and Sea Foam departments. The dustiest department was the Sea Foam department. The laundry soap department was not quite so bad. All the time he worked there the soap dust caused him to sneeze and cough and spit, sometimes irritating his tongue and mouth. He lost weight and had a cough most of the time. He got better and gained weight after leaving the plant. The soap dust made his nose raw on the edges and burned his nostrils. He was never instructed there were respirators; saw one or two in the I building. Sometimes he would wear a handkerchief over his nose and mouth to keep the dust out. He

saw several employees sneeze and cough and their eyes water. There was a fan, which he thought was an exhaust fan, in the Sea Foam department. He worked steadily for four years, and all the time he worked there the soap dust caused him to sneeze and cough and spit up yellow phlegm, irritated his tongue and mouth and made his lungs get tight. He lost weight and had to quit because he could not stand the dust. He got better after leaving the plant and gained weight.

The plaintiff, *Herbert Walker*, 39 years of age, was reared on a farm, went to school to the eighth grade, came to Kansas City in 1919, worked several places, learned the carpenter trade, worked outside until 1934 except for short periods in packing houses and about a year at the Proctor & Gamble soap plant in Kansas City. He was in good health and weighed about 135 pounds and had never had any trouble with his throat or lungs before he began working for defendant. He commenced working for defendant March 4, 1934, and quit May 6, 1938. He worked as a carpenter and millwright, making repairs to machinery, floors and equipment in the several buildings of defendant's plant in Kansas City. He worked in what is known as the Sea Foam, fatty acid, caustic soda, soap chips, soap drying and several other departments of defendant's plant. There were large quantities of soap dust in all these departments every time he worked there. The floor of the Sea Foam department was covered with soap dust. When working in the dusty departments the dust would cause his eyes to hurt and water and cause him to cough and sneeze. The coughing got worse. Between February and June, 1937, he began to get weak. His lungs got tight and his breathing became difficult while working in the dusty departments. He gradually got worse, until he had to quit. His throat got sore more often; he was unable to breathe freely; could not sleep; his chest hurt. He lost between ten and twenty pounds while working for defendant. During the latter part of the time he worked he would have attacks of difficult breathing that would last two or three hours. He coughed continuously during the last months. In June, 1937, he went to see Dr. M. A. Walker, who is not related to plaintiff. Doctor Walker told him it would be better if he worked at outside work. He went to his foreman and asked him to give him some work where he would not have to work in the dust because it made his throat sore. His foreman, Van Scyoc, told him the dust would not hurt him; that

there was nothing in the dust to hurt him, and he believed him and relied on it; that from about six months before he quit work his health was very poor; he had headaches; he could not sleep nights; he lost weight, became very weak, suffered from shortness of breath, was nervous, spit up yellow phlegm, coughed constantly, and had pains in his chest and was unable to do his usual work. When working in the dusty departments defendant did not furnish him a respirator or dust mask; he did not know it was necessary to wear them; no one told him to wear them. When plaintiff complained to his foreman about the dust making his throat sore the foreman would keep him away from the dusty departments for a time and then put him back. He worked in dusty departments for as long as five or six weeks at a time. After he had consulted Doctor Walker he was transferred from the mechanical department to the receiving department; worked on the loading dock. The foreman, Metmer, said: "You'll never make it on this job, but it's all I've got for you." His wages were reduced. Roy Kitchen, assistant superintendent, said:

"Walker, I'm sorry that by reason of your condition your services as a millwright are no longer beneficial. We'll transfer you to another department. I'll transfer you to a department where there's no dust."

While working plaintiff did not wear a respirator; did not see any in the mechanical department; saw the men in the caustic department wearing them. He never asked for one. On some occasions he wore a handkerchief over his nose and mouth to keep the soap dust out. The nurse at the plant asked him some questions about once each year and made out a card when he answered questions. He was treated by her for minor cuts and bruises. Plaintiff had an accident in 1936 and was in the hospital with an injury to his leg. When he returned to work he did the same work as before. When he quit work in 1938 he left Kansas City and went to Denver to live, on the advice of his physician.

*Dr. M. A. Walker,* a physician and surgeon, whose qualifications were admitted, first saw plaintiff about August 26, 1936. He had an infected knee and tetanus; hospitalized him; he recovered in ten days and was cured; no symptoms of bronchial asthma at that time. He examined plaintiff in June, 1937; he had typical bronchial asthma; his breathing was wheezy and could be heard all over his chest. The noises in his chest were such as occurred in bronchial

asthma. He saw plaintiff once or twice after that and examined him again on May 13, 1939.

"Q. And what was his condition when you saw him then? A. There still is nothing significant to indicate he ever had lockjaw; his wound is well healed and looks like a scar; and he still has asthma. Last Saturday the breathing sounds and the squealing noises in his chest were quite prominent; his weight was down, he only weighed 125 Saturday; his blood pressure was low, 105; he seemed to me to have failed a good deal since I saw him last. Except for the asthma he showed and except for his chest condition I saw nothing wrong with him."

The doctor was asked a lengthy hypothetical question predicated upon evidence previously offered and was asked to give his opinion whether—

". . . the condition that you found Herbert Walker to be suffering from in June, 1937, and in May, 1939, could have been caused by the inhalation of this dust? A. Of course it was."

After some suggested amendments to the question he was asked:

• "Could the inhalation of the soap dust under those conditions have caused bronchial asthmatic conditions that you found? A. Why of course it could.

"Q. Now, Doctor, what is bronchial asthma? A. It is a disease that occurs in people after sensitization that is characterized by a shortness of breath and a typical wheezing noise in the chest due to the fact that there are muscles around the bronchial tubes that are in contraction so that the air they breathe in they cannot breathe out very well, causing difficulty in breathing.

"Q. Over what period of time would you expect the inhalation of soap dust under the circumstances which I have described to produce a chronic bronchial asthma? A. Well understand, I am no asthma specialist, but I have seen a great number of cases and it is my understanding that when a person is exposed to the conditions which produce asthma they may develop asthma by the repeated exposures and if there are repeated exposures they are much more apt to cause the condition.

"Q. Is this condition of asthma something that comes on over a period of progressive irritation? A. Undoubtedly the more irritation, the worse it gets."

### Cross Examination.

"Q. Due to the fact he has asthma, the exposure to dust increases the irritation? A. Yes, sir; and in acquiring asthma the exposure to dust helps to bring it on. . . . A. I didn't examine him, sir, to treat him. He has been going to someone else, some other physician for treatment and at that time he had been trying various treatments, apparently over a period of a few months, from other doctors and going to the drug store and getting medicines; and he came to me because he wanted to see if I could do anything that would do him any good. I only saw him the one time, the one occasion and I simply examined him and confirmed the diagnosis that he already had or that he had bronchial asthma."

*Dr. Miles Nason,* a physician and surgeon whose qualifications were admitted, saw plaintiff at his home September 23, 1937.

"At that time he was just semiconscious. It was in the middle of the night. He was having fainting attacks; extreme weakness; no particular complaint of pain at that time; just extreme weakness and fainting attacks."

He treated plaintiff frequently, off and on, until. June 2, 1938.

"After that first emergency call I examined him quite thoroughly. He had a chronic bronchitis at that time. Since that time he has had repeated acute colds and more or less of a chronic lung condition, which I treated. On November 6th he developed an asthmatic condition.. . . . Inability to expand his chest fully, very labored breathing; . . .

"Asthma is a condition of the lung in which the bronchial tubes, the air tubes, are contracted down and they are partially in a state of paralysis so that the patient cannot breathe by expelling the air. In so doing they store the dead air in the lungs. The amount of fresh air they breathe is not enough to produce a proper aeration of the blood. They more or less breathe in a decreased amount of air which is less than the capacity of their lungs and less than the amount which is necessary for full oxygenation, that is the full amount of oxygen to the blood to keep it normal; and that makes them breathe faster and harder in an attempt to compensate for the lack of aerated blood and for the lack of ability to take in the proper amount of oxygen. That makes it very distressing; makes them breathe fast."

Asked to tell the jury the mechanism of the disease, witness answered:

"A. The effect of the inhalation of any foreign article into the lungs depends upon two things as to its ultimate effect upon the lung tissue. One is whether this dust is soluble or insoluble, whether it will dissolve in water or not dissolve in water, or come into solution. This particular dust is picked up in the lung by a large cell called an endothelial leucocyte. It is a large white cell which develops a mechanism by which it encloses the foreign substance and picks it up and throws it out so that it will cause no more trouble. For instance in this case where the dust is soluble and goes into solution, the white cell encloses the soap dust, and this soluble product, being a caustic, dissolves, actually dissolves, the lung tissue. It is a protective mechanism.

"Q. Now, Doctor, may I interrupt you? When you say the caustic dissolves the white cells, you mean destroys them? A. Destroys them. Releases the caustic into the lung tissue, producing an irritation, which irritation in turn causes scar tissue, and the scar tissue contracts the bronchial tubes, as it gets older it contracts. The scar tissue itself would cause a permanent narrowing of the air passages of the lungs, and it produces a more or less chronic irritation of the air passages of the lungs, and a person who is susceptible or who once has it will always catch cold a lot easier than a normal person.

. . . . . . . . . . . . . . . . . . .

"Q. Doctor, is it known to the medical profession, and recognized in the authorities, that the inhalation of dust, soap dust, is harmful? A. Yes.

"Q. Has that been recognized as long as five years? A. Yes.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. You said, Doctor, the breathing of soap dust and its coming in contact with the moisture of the bronchial tubes causes the release of the caustic soda in the soap, and that sets up irritation in the tubes, is that correct? A. Yes."

A hypothetical question based upon the evidence was propounded and the witness was asked:

".   .   . would you say that the bronchial asthmatic condition which you say he now has, have been caused by the inhalation of dust? A. Yes."

The witness also testified that working under those conditions it was perfectly possible for the bronchial asthmatic condition to develop in two or three years. He further testified the condition was the result of irritation caused by the particles of dust, and an examination of the perhaps 1,000 persons working in soap plants in Kansas City, where they are subjected to dust which they breathe constantly, would show a certain tendency to respiratory infection, which would be common in the occupation and which would show they had a certain amount of irritation in the bronchial tubes. He further testified that the fact plaintiff took anti-tetanus serum would have no effect on the development of the asthmatic condition. He further testified that he thought the condition would get progressively worse and that it was permanent; that if plaintiff continued to live in Colorado he might live ten years, but if he returned to Kansas City he might live five years.

*Dr. George C. Stemen,* a physician and surgeon of Denver for 47 years, examined plaintiff July 17, 1938, and received the history of his having worked in a soap plant in Kansas City. He found plaintiff "had broncheria, a chronic bronchitis, a bronchial asthma. Examined him three or four times, the last time being on March 13, 1939." His breathing had become more difficult, and on the last examination he found a cardiac condition, probably due to the bronchial asthma. He testified that quantities of ordinary soap dust would be sufficient to cause the condition he found plaintiff to be in and expressed the view, "this man  .   .   . will die of pulmonary tuberculosis within five years. There is none there now, but the history of the case indicates he will have it soon." He further testified that in his 47 years of practice he had made a study of the effect of soap dust and other dust in connection with occupational diseases, and that the effect of dust in industry has been given extended discussion in medical journals in the past few years, and

further expressed his opinion that plaintiff's condition "is entirely due to the irritation produced by the dust in the caustic soap"; that the soap dust in the plant would affect all the workers who were compelled to breathe it, some to a greater extent than others.

*Dr. Vanston H. Ryan,* professor of chemistry at Rockhurst College, Kansas City, Missouri, testified that sodium carbonate is a poison, and it does produce irritating effects upon the body. The main ingredients of soap are fatty acid and caustic soda or lye or sodium hydroxide; that when the two elements are brought together they lose their natural characteristics and form a new product which we call sodium salt or fatty acid, or more commonly known as soap; that when moisture or water combines with the soap "a reversion of that reaction takes place, called hydrolysis. That is, the water reacts on the soap and such reaction produces sodium hydroxide and fatty acid." In other words, it returns to its original state.

"Caustic soda is very caustic. Caustic means burns. Reaction is more rapid when the soap is in fine dust particles than when it is a solid block. If it got on some particularly tender tissues or on the surface of the skin it is far more irritating."

These things are commonly known to chemists and have been for many years.

*Dr. H. W. Kassel,* an X-ray specialist, testified he made X rays of plaintiff's lungs and throat May 15, 1939; that the X-ray plates showed a marked increase of lung markings that are evidence of fibrosis; they show evidence of chronic bronchial asthma; that irritation will set up the fibrosis which is shown on the X-ray plates. There is no evidence of anything that would be caused by street dust or coal dust or sand. Dust of ten microns in size and over ten million particles per cubic foot is necessary to be seen in an X-ray picture. He could not state how long the scars had been present in plaintiff's lungs. The X-ray pictures showed an irritating substance. He did not know what, but it is a soluble, for there is no evidence of a deposit of solids.

*Mrs. Herbert Walker,* wife of plaintiff, testified she had been married to plaintiff 19 years; that he started coughing about February, 1937; that from that time on he lost weight, became weak, could not sleep at night, was coughing, and she massaged his chest; that he had various asthmatic attacks, commencing about September, 1937; that he still has them; that he got worse from June, 1937,

to May, 1938; that plaintiff moved to Colorado in June, 1938; that he does not work every day, is not strong, and frequently awakens at night with coughing spells.

The court appointed a commission of four physicians—Doctors Bresette, Gloyne, Grosdidier and Allen—to examine plaintiff and take the necessary X-ray pictures.

*Doctor Bresette* testified that he examined plaintiff, whose tonsils showed slight evidence of inflammation; expiratory wheezes became more numerous; plaintiff has bronchial asthma which is chronic of at least one or two years' standing; may have had asthma all his life, but if he did not have it in 1936 he has gotten it since that time. There appears a heavy fibrosis of the lung fields. In his opinion plaintiff is allergic to dust. Asthma is usually due to allergy, which is individual sensitiveness to a foreign protein. People who work in wheat mills, stables, etc., where there is protein dust, may have asthma as an occupational disease. It may take some time to develop sensitiveness to certain substances.

*Doctor Gloyne* testified he examined plaintiff and found him suffering from bronchial asthma, which could have existed longer than since June, 1937. Plaintiff's asthma is due to allergy. His attacks while at home and away from soap dust would indicate that soap dust was not the cause of the asthma; they may have been brought on after exertion. The breathing of dust may cause asthma if a person is sensitive to it. There are many forms of asthma and various causes, and it is almost impossible to say what causes a man's asthma from one examination. Asthma is not caused by fibrosis, but is caused by spasm.

*Doctor Grosdidier* testified that plaintiff is suffering from chronic asthma. Asthma must be caused by a foreign protein. Any protein might cause it. Witness does not consider caustic soda a cause of asthma and does not think soap dust would cause asthma. He did not find an abnormal amount of fibrosis in the lung; found about as much as is normal for an asthma patient. If plaintiff was working in the soap dust he might develop some bronchia thickness, and if he was sensitive it might cause increased bronchia thickening. To have asthma one must have allergy. Heat, exertion, etc., may bring on an asthmatic attack, but is not the cause of asthma. If plaintiff worked in defendant's plant three years without having asthma it would eliminate soap dust as a cause. He doubts whether inhaling soap dust would cause peripheral fibrosis. One couldn't determine

the cause of a man's asthma even by seeing him every day. Fibrotic mottling is found in all instances where there is a lung condition. In making skin tests to determine the cause of asthma the different possible allergens are used in a solution of sodium hydroxide. From this he would conclude that persons are not allergic to sodium hydroxide. If plaintiff left the soap plants and got away from the dust and the attacks became less frequent it would be natural to assume that the soap dust was the exciting cause.

*Doctor Allen* testified he is an X-ray specialist; made certain X-ray plates of plaintiff's lungs and chest. Plaintiff has asthma. He found some fibrosis in the lungs; could not tell how long it had been present. Soap dust was probably not a factor. There are a number of causes of asthma. In his opinion exposure to soap dust was not a factor in producing plaintiff's asthma. Doctor Kassel's X-ray plates are essentially the same as his. The causes of asthma never have been definitely determined.

The testimony of witnesses called by defendant may be summarized as follows:

*Dr. C. C. Nesselrode,* professor of surgery at the University of Kansas Medical School and a qualified practicing physician for many years, testified he was medical adviser for defendant for ten years and doctor for Proctor & Gamble for twenty years; has made frequent trips through both plants and has examined soap plants at Cincinnati, St. Louis, Chicago and Kansas City. It is impossible for a person to contract bronchitis or asthma from breathing soap dust. Bronchitis is an infectious disease. There are no germs in soap, because soap kills germs. Asthma cannot be caused by soap dust except when a person is allergic. There is a small percentage who are allergic to soap dust. There is nothing inherently dangerous or poisonous to humans in soap dust at the plant, and the witness so advised defendant. However, it is annoying to some people who for that reason wear respirators. There are no harmful fumes in the cooking room, although there might be something in the fumes which would be poisonous if in concentrated form. The medical authorities do not mention soap dust as a cause of disease or an industrial hazard, and he has so advised defendant. There is soap dust in all soap plants that he knows about. Alkali cannot get into the lungs because it is neutralized and washed out before it reaches the lungs. If plaintiff was allergic he would develop asthma almost immediately in coming in contact with the soap

dust. However, allergy might develop slowly. Ninety percent of asthma is due to allergy; the other ten percent is due to cardiac thymus and other difficulties. Caustic soda is used in making soap. The amount of irritation depends upon the amount of soap dust breathed. Constant irritation will make tissues more susceptible to bronchitis germs, but soap dust will kill the germs.

*Dr. Royce H. LeRoy,* a chemist and professor of chemistry at the University of Kansas since 1926, testified he had made a special study of soap solutions. There are none of the properties of caustic soda or fats carried over into the soap. When you add water to the soap it hydrolyzes it; some of the alkalis and acids reappear. The maximum alkalinity of concentrated soap solution has a pH of approximately 10.5, which corresponds to the alkalinity of a solution containing two parts of caustic soda to 100,000 parts of water. Mucin is an amphoteric protein material secreted by glands in the mucous membranes. By amphoteric is meant that the mucin will neutralize both an acid and an alkali. If soap dust, soda ash or sodium hydroxide came in contact with the mucous of the throat each would be neutralized. There is a law in Germany against soap containing more than two-tenths of one percent caustic soda. The witness does not know how much caustic soda is used by defendant in making soap. Caustics are not volatile at less than 1,000 degrees centigrade, which means there would be no caustic in the fumes at the plant. He has never worked in a soap plant, but has done research work in soap. He does not know how much mucin in the body, but cold or a foreign irritant such as soap dust would cause more mucin to be produced. Two-tenths of one percent of caustic soda is considered injurious.

*Dr. Robert M. Isenberger,* physician and professor of pharmacology at the University of Kansas Medical School, testified he had made a special study of drugs and chemicals and their effect on living tissue. His time is devoted exclusively to teaching. Caustic soda in diluted solution is not poisonous; is not caustic until it gets beyond a ten percent solution. A man may be allergic to many things, but cannot be allergic to a caustic or get asthma from a caustic, because there has to be a foreign protein in a substance in order to cause asthma, and there are no proteins in soap dust or in caustic. When water is added to soap it hydrolizes, but at the same time it dilutes and renders harmless the free acid and alkali. Physicians use alkali in solutions in washing out stomachs, and soap is

used as an enema. If soap dust gets in the nose a sneeze is the result, because of the tender mucous membrane of the nose. Even distilled water will cause sneezing and the eyes to water. Mucous is a secretion of the glands which neutralizes both acids and alkalis. A cold, as such, cannot be produced by soap dust. The body has many lines of defense against breathing soap dust or other foreign dusts or substances: (1) The hairs of the nose, which act as a filter; (2) the mucous membrane, which swells up, preventing the dust from getting into the throat; (3) the cilia or minute hairlike processes which tend to force out dust particles; (4) sneezing and coughing, which result from the irritation and which force the dust out of the nasal passages and throat; and (5) mucin in the mucous membrane which neutralizes the alkali or acid which comes in contact with it. The witness demonstrated to the jury by solutions in test tubes the neutralizing effect of mucin on concentrated solutions of soap, caustic soda, soda ash and soap dust. He also testified that he conducted experiments on animals for three weeks. One experiment was to place an animal in a box and blow clouds of soap dust into the box. The animal was subjected to this every three days. He tested the animal as long as thirty minutes every day, but did not examine the tissue of the animal. He watched the animal for another week after he had finished the test before he was satisfied he was fully recovered. The normal alkali contents of soap could not cause asthma. Soap dust is not inherently dangerous or poisonous. It is not harmful for a man working in soap plants to inhale dust. He has not reached a definite decision as to whether soap dust is harmless or not.

*Dr. Ferdinand C. Helwig,* a physician and assistant professor at Kansas University Hospital, has made a special study of soap dust since this case arose, but had made no study of it prior thereto. He testified when soap goes into solution a very weak alkali is released. Mucin renders alkali innocuous. The amount of free alkali in soap solution equals a tablespoonful in a barrel of water. One could drink this and it would not even neutralize the acids of the stomach. Soap dust has no effect on tissue except to increase the secretion of mucin. Spasms of the glottis will prevent dust from entering the lungs, and mucin will neutralize the alkali. He understands people build up a tolerance for soap dust. Free caustic soda could not cause asthma. Asthma is not a sign of silicosis. He did not say that no soap dust gets into the lungs, but he doubts if particles of soap dust

get beyond the glottis. It is impossible to get alkalis into the bronchial tubes in harmful quantities. A person may become immune to any irritant. The exact functional nature of asthma is not known.

*George Wilms,* had worked for defendant since 1930 as a carpenter; worked with plaintiff about ten percent of the time; does not see a lot of difference between his appearance now and when he started to work. He used the respirator very little, as the dust never bothered him. He came from Germany. Plaintiff used a respirator or a handkerchief when he worked inside the dust collector. During the last two months plaintiff worked he complained of the dust affecting him, and he used a lot of medicine these last two years at the plant. After plaintiff came back from the hospital he was sick and couldn't work very well and spent about 75 percent of his time in the shop.

*Virgil Thompson* worked for defendant sixteen years. In fixing screens he ties a handkerchief over his face. The dust has not affected him yet. In 1938 he went to Doctor King for his asthma, which had been bothering him since 1936. Had a tightness about his chest for about two years. He changed his eating and it stopped. Has worked in the chip department and in the Sea Foam department; does not have a lot of colds.

*William F. Van Soyoc,* carpenter, millwright and painter foreman for defendant; has an average of ten men in his gang; plaintiff was one of the men and worked more or less in all the buildings. It is his custom to divide the disagreeable places among the men. The powder house and Y tower are the worst, so far as dust is concerned. The dust was worse before they installed the dust collectors. The Super Suds department is in a separate building. Had worked for defendant twelve years. When he first went to work in the plant there were very limited dust collectors, but more have been put in since, mostly in the powder house. The dust collectors are modern. There have been six dust collectors put in the L building in the last five years, and there were some before that. There are no collectors on the toilet soap floor or in buildings A, B and C. In R building the collector was made by the plant. The dust collectors are not adequate to carry off all the dust. Use of goggles and respirators is not compulsory, but the men can get them if they want them. He saw plaintiff with a respirator fifty percent of the time. Witness never wore one—would rather take the dust. Some employees use wet handkerchiefs because they are less burdensome.

Plaintiff had average number of colds and coughed and sneezed some. Was below the rest of the men in proficiency. He improved gradually, but the improvement ceased the last year in the plant. He was ill with tetanus; after that his work was poor; he was much lighter; and witness gave him the easiest end of the work; that is, plaintiff did most of his work in the shop; sent plaintiff into dusty places only in emergencies. Plaintiff didn't complain of asthma or sickness until his lockjaw, but told witness he had told the nurse he had asthma; said the dust irritated it. Witness has heard of several men who claim to have been harmed by the dust. The employees made suggestions for dust elimination, some of which were adopted and some of which were not because they were too elaborate. Witness knows of nothing dangerous in the dust and knows of no one who claimed that the fumes hurt him. Plaintiff only spoke to witness about the dust affecting him when he had those spells; said the dust irritated him; that he experienced a choking sensation.

*Howard Babbitt* had worked for defendant since January, 1937; was vice-president of the union and on the bargaining committee. He worked in the same gang with plaintiff; does not remember whether plaintiff had goggles or respirator. Plaintiff worked in the shop most of the time. When he worked with plaintiff in the Twitchell department plaintiff could not do the work satisfactorily and was put to work in the shop. After a discussion between the bargaining committee and the management plaintiff was transferred to the shipping department, but still complained and was removed to the receiving department, and while working there quit. His pay was lowered when he was moved to the shipping department. There have been complaints about dust and fumes, but the management has coöperated and placed fans in different departments. Plaintiff said the dust affected him; that he had asthma, but did not say that there was any connection between his asthma and the plant. The dust of the plant makes one sneeze if a respirator is not worn, but he had heard no one complain of the dust affecting his health. The bargaining committee recommended dust-proof bins in the Sea Foam department. These were the only improvements made in that department since witness has been at the plant. Last year dust collectors were installed just outside the Sea Foam department. However, there is still quite a bit of dust in the Sea Foam department and he saw several other men in that department using respirators.

*Charles Johnson* worked nine months at the plant in 1928, then worked for Proctor & Gamble for six years; came back to defendant's plant in 1936 and worked until September, 1938, in the millwright gang; worked with plaintiff at both places; never saw him use a respirator. Plaintiff didn't complain about the dust when witness worked with him, but did say he had asthma and the dust bothered him.

*Dewey Johnson* worked in Sea Foam and framing departments about seven years. Dust has had no ill effect on him and he knows of no one who has been made ill by the dust. The Sea Foam department is the dustiest in the plant. Not over five percent of the persons working there use respirators. He saw plaintiff working in the department, but not often. They have Draco dust collectors in the Sea Foam department and the windows are open most of the time. The dust causes him to sneeze and cough sometimes.

*Howard Goldsberry* has worked at the plant 19 years; never heard anyone complain of dust except Lawrence Vincent; probably saw him sneeze and cough. Witness never has been made ill by the dust and has always been in good health.

*Sherman Reeves* worked in the department where the soda ash is unloaded, for six years the first time and eight years the second time, in the labor gang, where he worked all over the plant. The Sea Foam department was pretty dusty. Worked a year and a half in the Twitchell department; now works in soda ash. Soda ash now comes in box cars and is removed from the cars with suction pumps. It is necessary to get inside the box car to unload the soda ash. "It will burn if you do not blow it off." When so unloading you get dust on you, but it doesn't hurt you; had noticed no ill effects to anyone who works in the soda house.

*E. R. Kitchen* has worked for defendant 20 years and is assistant superintendent in charge of labor relations and standards; has been a chemist for 12 years. In the dryer room there are ventilating fans and a Texas deck. In the powder room there are two Draco dust collectors; one has been there for 20 years and the other for five or six. A Draco machine is a suction machine. There are homemade dust collectors in the soap chip department. The Sea Foam department, which includes the Super Suds, is the dustiest. In the framing department it is not dusty, but there is soap on the floor, which is periodically scraped up. All departments are swept and kept clean. He is fairly well informed on the equipment used

in the soap industry and defendant's equipment is up to par, although it is not as good as one or two recently built plants. The plant always tries to keep up. It has changed types of respirators, increased dust-collecting equipment, etc. Van Scyoc complained that plaintiff was not doing his work. Witness told plaintiff that he would be transferred because his work was not satisfactory. Plaintiff said he didn't think he was getting fair treatment. He was transferred to an easy job. There are no poisonous fumes in soap making. The only fumes are in the kettle department. In the bleaching department there is zinc and sulphuric acid, which is pumped into the kettles. There are no systems in the soap plant that can prevent dust. In soap dust hydrolysis there would be as much alkali as in milk of magnesia. No one has claimed to have contracted asthma from soap dust, although some of them have complained the dust is irritating. He has heard some claim that their asthma was due to the soap dust. Caustic soda is a corrosive poison, but is not poisonous to humans, but is corrosive to human tissue. Workers in the plant who have asthma got it after they started their work there.

*Roy Kitchen* has been assistant superintendent and chemist about 20 years. There is no dust in any department except the Sea Foam. He is not familiar with the ventilating system, but knows they have increased the dust collecting equipment in the Sea Foam department and have improved the type of blowers. They have had lots of claims by people working in the plant that soap dust affected them, but those people had asthma. There are a number of people working in the plant who have asthma. He never heard of anyone claiming to be affected by the dust. They had some claims that dust had made persons become affected with asthma, and when this happened they would transfer them to a less dusty department. He has heard of others who claimed they got asthma while working in the plant. He has told employees there was no harm in soap dust. Those who have asthma got it after they started to work there. Never heard of plaintiff's asthma until April, 1938.

*K. A. McVey* employed by defendant since 1912 and plant superintendent since 1921. The plant employs 350 to 500 people, mostly men. He employed plaintiff, who looks better now than when he applied for work. Remembers plaintiff suffered from tetanus and upon his return to work they gave him light work. Witness received a letter from Doctor Walker telling him to put plaintiff in less dust

because of his bronchial asthma. After that time plaintiff was put to work in dusty places only in emergencies. The first time witness learned plaintiff complained his asthma was due to the dust was when he received a letter from plaintiff after he had quit the plant. Witness is familiar with the dust of soap, and there are no poisonous fumes or gases escaping from soap. Soap dust is not harmful. There is no method known of keeping dust from escaping in soap plants. The dust is worst in the Sea Foam department. In May, 1939, samples of dust from several departments were gathered and submitted to the Kansas City testing laboratories. There has been no change made in the ventilating system during the last five years except in the chip dryer department. These changes were made to correct temperature conditions. Another change was made in the Sea Foam department. The new apparatus installed does prevent the escape of some dust, and the dust is much less now than four or five years ago. Ever since the World War people are becoming dust conscious. People will not tolerate such conditions. Witness has visited plants in Chicago, Newark, Cincinnati and Berkeley, California. Ventilating systems are practically standard in all plants. The Proctor & Gamble of Baltimore is the most modern. Respirators are there and men can get them whenever they want them. There are not more than ten respirators in the entire plant. They do not require employees to use respirators or handkerchiefs. They have not posted any notices warning employees about soap dust affecting them, because there is nothing inherently harmful in soap dust, and did not advise the men because the danger does not exist. Did not have periodical examinations of the men because they have a nurse who makes out report cards. Those pertaining to plaintiff were made out in September, 1935, 1936 and 1937.

*Bryan Wilson* testified he is a soap maker; works in the kettle room, where there are five to ten vats boiling all the time. He tastes the soap while cooking it; has been doing that every day for 24 years. He tastes the lye with his tongue, but not very strong lye. No one has ever been burned by soda ash in the kettle room. There are bound to be some fumes arise from cooking the soap, but the ventilators take most of the fumes away and they don't bother him. He has grown fat while working there. Caustic will burn the skin if not removed.

On May 26, 1939, the jury returned its general verdict for plaintiff and answered special questions as follows. (We print in italics the answers later set aside by the court):

"1. Is plaintiff suffering from any disease? A. Yes.

"2. If you answer the above question in the affirmative, state: (a) The disease from which he is suffering? A. Bronchial asthma. (b) The approximate date such disease was contracted? A. Spring, 1937. (c) Whether said disease is an occupational disease incident to working in and about defendant's soap manufacturing plant? A. *Yes.*

"3. Does the average employee working about a soap manufacturing plant and doing work similar to that done by plaintiff suffer any similar ailments or disabilities to that you find the plaintiff suffering from? A. *Yes.*

"4. Did the defendant or any of its agents or officers in the Kansas City, Kansas, soap plant have any knowledge of such a disease or diseases being contracted by any employee working for the approximate time the plaintiff did in buildings and surroundings in said plant prior to the time plaintiff contracted said disease or diseases as found by you? A. *Yes.*

"5. If you answer the foregoing question 'Yes,' give the names of each person who contracted such disease or diseases before the approximate date plaintiff · contracted it or them, and state the approximate time each person so named contracted each disease? A. *Mary Whipple and Robert Larkin, prior to spring of 1937.*

"6. Was the defendant advised by a doctor or doctors prior to the approximate date plaintiff contracted the diseases, if you find he did contract such diseases, that the dusts and fumes about its manufacturing plant would not be harmful or cause any diseases to the average employee working in the various departments thereof? A. Yes.

"7. Were the soap dusts in the parts of said plant where plaintiff worked inherently poisonous or inherently harmful to the average employee in the places and under substantially similar conditions existing during the time plaintiff worked there? A. Yes.

"8. If you answer the foregoing question 'Yes' (a) Name specifically each constituent material in such dusts that renders them so poisonous or harmful? A. Caustic soda, soda ash and silicate.

"9. Did the defendant, while plaintiff was in its employ, furnish such appliances and equipment, and pursue such methods of operation as were usually furnished and maintained in soap manufacturing plants in the United States? A. Yes.

"10. If you find for the plaintiff, state specifically each act or thing done or omitted to be done by the defendant that you find was negligence on its part in not giving the plaintiff a reasonably safe place in which to work? A. (1) *By not furnishing a respirator as a part of his working equipment and making it compulsory to be worn when working in dusty compartments;* (2) *by not providing proper ventilation; by failing to have plaintiff examined by a physician at proper intervals.*

"11. If you find plaintiff suffering from asthma or chronic bronchial asthma, state whether the asthma is due to his being allergic to soap dust or some protein contained therein. A. No."

On May 29, 1939, defendant filed a motion to set aside, as not being sustained by the evidence and as being contrary to the evi-

dence, the answers to special questions numbers 2(c), 3, 4, 5, 7, 8, 10 and 11. On the same date defendant filed a motion for judgment in its favor on the special questions notwithstanding the general verdict, and also filed a motion for a new trial. On June 10, 1939, these motions were heard by the court and taken under advisement. On May 29, 1940, the court, in a written opinion, ruled upon the motions, sustaining the motion to set aside answers to special questions numbered 2(c), 3, 4, 5 and 10, and overruling it as to answers to special questions numbered 7, 8 and 11. On the same date the court sustained defendant's motion for judgment on the answers to special questions notwithstanding the general verdict. The motion for a new trial was not ruled upon.

Plaintiff served and filed his notice of appeal July 12, 1940. In the time which had elapsed since the trial in May, 1939, the court reporter who took the shorthand notes of the testimony had become physically and mentally ill and could not transcribe his notes. No one else could be found who was able to transcribe them. Proceeding under G. S. 1935, 60-3318, with the coöperation of counsel, there was prepared and filed a statement by the court of evidence and proceedings in the trial of the action in lieu of a transcript of record.

A few applicable legal principles may be stated. When this court is passing upon whether there was sufficient evidence to sustain a general verdict, or answers to special questions, which verdict or answers had been approved by the trial court, we consider only the evidence tending to support the verdict or the findings. (*Smith v. Lockridge,* 145 Kan. 395, 397, 65 P. 2d 345, and cases there cited.)

The function of the trial court is different. When a general verdict is returned by the jury it becomes the duty of the trial court to determine whether the verdict should be approved. This is said to be one of the most important duties of the trial court. In doing so the court should exercise an independent judgment formed from judicial consideration of the evidence. This rule has been discussed so thoroughly in former decisions that there is no need to expand the discussion here. (See *Posey v. Johnson,* 145 Kan. 742, 745, 67 P. 2d 598, and cases there cited.)

The same general rule applies to the court's approval of answers to special questions, except that a special question pertains to a particular fact; rules of law are not involved. (*Swan v. Salt Co.,* 86 Kan. 260, 119 Pac. 871; *Shore v. Shore,* 111 Kan. 101, 205 Pac. 1027; *Kansas Wheat Growers Ass'n v. Rinkel,* 126 Kan. 733, 734, 271 Pac. 311; 64 C. J. 1183.)

In a case such as this, an action at common law for damages, in which the parties are entitled to a trial by jury, the court's powers extend no further than to approve or disapprove the verdict, or the answers to special questions. It has no authority to render a judgment contrary to the verdict nor to find an answer to a special question opposed to that returned by the jury. To permit that to be done would be to force the parties to a trial by the court and deny them a trial by jury. The court may not substitute its judgment for that of the jury. (See *Tritle v. Phillips Petroleum Co.*, 140 Kan. 671, 676, 37 P. 2d 996, and authorities there cited.)

In ruling upon the motion to set aside answers to special questions the court filed a written statement of its ruling and its reasons therefor. We think we should do no more than express our views as follows: (1) If the findings had been approved by the trial court and were attacked here as not being supported by the evidence we would experience no difficulty in finding in the evidence above summarized ample to support each of them. From this it does not necessarily follow that the trial court erred in its ruling, for the trial court could pass upon the credibility of witnesses and the weight to be given to their testimony, while we could not do so in the situation suggested. (2) The trial court, in its ruling, took into consideration certain principles of law, citing opinions of this and other courts. This was improper; the jury was finding specific facts from evidence, and their answers should have been interpreted from that viewpoint. (3) The court had no authority to make findings, which amounted to answers to the questions, contrary to those made by the jury, as the court's written rulings indicate was done. The limit of the court's authority was to approve or disapprove the findings. (4) The questions to which the answers were set aside stand, therefore, as though no answers had been made to them, or perhaps as though the questions had not been submitted.

We think it should be noted that question No. 5 should not have been submitted, for the reason it was impossible for the jury to have answered it from the evidence. Testimony of several witnesses was to the effect that a number of defendant's employees had asthma, contracted while in defendant's employ. Their names were not stated. Defendant's officials knew this and that some of them were claiming the disease was brought about by the conditions under which they worked, and so testified, although formal claims of that character had not been made. A jury should not be required to

answer a question impossible to be answered from the evidence. (*Mayes v. Kansas City Power & Light Co.*, 121 Kan. 648, 249 Pac. 599; *Alliston v. Shell Petroleum Corp.*, 143 Kan. 327, 342, 55 P. 2d 396.) More than that, it called for a finding on a fact not material to a decision in the case.

We pass to the ruling of the trial court sustaining defendant's motion for judgment on the answers to the special questions notwithstanding the general verdict. In passing upon that motion the court could consider, of course, only those special questions the answers to which it permitted to stand. The rule in this state, clearly established by statute (G. S. 1935, 60-2918) and by court decisions (see *Marley v. Wichita Transportation Corp.*, 150 Kan. 818, 822, 96 P. 2d 877, and cases there cited), is that special findings of fact control the general verdict only when they are inconsistent with the general verdict. It is the duty of the trial court to harmonize the findings of fact with the general verdict, if that can reasonably be done, and not to consider them with the view of overthrowing the general verdict. (*Montague v. Burgerhoff*, 152 Kan. 124, 128, 102 P. 2d 1031, and cases there cited.) In *Craig v. Sturgeon*, 151 Kan. 208, 98 P. 2d 139, it was held:

"As against the general verdict nothing will be presumed in favor of the special findings, but the latter may be viewed and interpreted in the light of the testimony." (Syl. ¶ 2.)

See, also, *Dick's Transfer Co. v. Miller*, 154 Kan. 574, 119 P. 2d 454.

It is the rule also that special findings must be considered as a whole. (*Billings v. City of Wichita*, 144 Kan. 742, 62 P. 2d 869.)

Applying these rules, the question to be determined is whether the answers to the special questions approved by the court, being answers to questions Nos. 1, 2a, 2b, 6, 7, 8, 9 and 11, are so inconsistent with the general verdict that the latter cannot stand. Certainly there is nothing in the answers to 1, 2a, 2b, 7, 8 and 11 which could have that effect. As found in the answer to 6, defendant had been advised by doctors the dust and fumes about its plant would not be harmful or cause disease to the average employee, but by answers to 7 and 8 the jury in effect found the advice was not good. More than that, the evidence did not disclose any time within nine or ten years when defendant has been told that by the doctors. It further disclosed defendant did not rely wholly, if at all, on that advice. Its officers recognized that since the World War people were becoming "dust conscious" and "people would not stand for

such conditions," and had gone forward in efforts to eliminate obnoxious or dangerous dusts and fumes to the extent that such efforts were 35 percent efficient. Answering question 9, the jury found defendant furnished such appliances and equipment and pursued such methods of operation as were usually furnished and maintained by soap manufacturing plants. While this is sometimes sufficient to relieve liability it is not the test. The test is, did defendant use due care? "The test is reasonable care, not customary usage." (*Grammer v. Mid-Continent Petroleum Corporation*, 71 F. 2d 38, 41, citing cases.)

In *Texas & Pacific Ry. Co. v. Behymer*, 189 U. S. 468, 470, 23 S. Ct. 622, it was said:

"What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."

In *James Baird Co. v. Boyd*, 41 F. 2d 578, 582, it was said:

"There is no need for the citation of authority to the effect that the obligation of the master to provide a safe place for his employees to work is an absolute obligation and may not be delegated to those in his employ; and, while customary methods may be considered in determining whether or not this duty has been properly performed, they do not constitute a controlling test, and it should be left to the jury to determine whether, under the circumstances of the case, the provisions made by the employer were such as a person of ordinary prudence would have made for the safety of his workmen."

For general treatment of the subject, see 39 C. J. 466, and 35 Am. Jur. 553. See, also, Gen. Dig., Master and Servant, Key No. 135, where many cases on the point are digested.

There is much in the evidence to indicate defendant knew the equipment and methods used needed much improvement. The union's safety committee repeatedly suggested changes which should be made. Some of the changes suggested were made, others were not for the reason "they were too elaborate." Defendant made improvements on its own initiative. Some of these, designed for other purposes, eliminated a great deal of dust. The result is, the answer to question 9, taken together with other approved findings and the evidence, is not so inconsistent with the general verdict as to require or justify setting the general verdict aside. It was simply one of the many facts to be considered by the jury in reaching a verdict.

We think the court erred in sustaining defendant's motion for judgment upon the answers to the special questions.

Both the trial court and appellee appear to have relied heavily

upon our decision in *Allen v. Shell Petroleum Corp.*, 146 Kan. 67, 68 P. 2d 651. We do not care to detract from anything said in that case, but we think the facts in that case are so different from those shown by the record here that an adherence to it does not require an affirmance of the judgment here. We shall not take space to point out those differences, since this opinion already is too long. And for the same reason we shall not further analyze cases cited by counsel. We have read and considered all their argument and the authorities cited.

The pleaded defenses of assumption of risk and contributory negligence were found against defendant, and we think rightly so, by the general verdict of the jury.

Appellant asks that we direct judgment to be entered for plaintiff upon the general verdict. We cannot do so in this case for the reason the trial court has not approved the general verdict, and no judgment should be entered upon a verdict which has not been approved by the trial court. There is no specific order of the court in the record either approving or disapproving the general verdict. In this respect the case is much like *Torpey v. Kansas City Public Ser. Co.*, 149 Kan. 735, 89 P. 2d 899. In the light of what has been heretofore said we think the court should give its judicial consideration to the general verdict. The power and duty of the court in this respect is so fully outlined in *Ward v. Grant*, 138 Kan. 363, 371, 26 P. 2d 279, and so peculiarly applicable here, that the court deems it worth while to restate what was there said:

"In an action triable to a jury, under our constitution and statutes, it is the function of the jury to pass upon the credibility of witnesses and the weight to be given the evidence. It is the function of the court to approve or to disapprove the verdict of the jury. Naturally in doing so the court must weigh the evidence and pass on the credibility of witnesses, but it is done with the view of determining whether the verdict of the jury shall be approved. Having considered and weighed the evidence and passed on the credibility of witnesses, if the court conscientiously can approve the verdict of the jury, that should be done. If it cannot do so, the verdict should be set aside and a new trial granted. In actions where the parties are entitled to a jury trial as a matter of right, the court is not authorized to take the case away from the jury and decide the same in accordance with its own views respecting the credibility of witnesses and the weight to be given to the evidence. To permit that to be done would be to deny the parties the right to a trial by jury. It is sometimes said the court sits as the thirteenth juror in cases of this character. Such a statement taken literally is inaccurate. The court does not sit as a juror at all. The statement has merit, if used in a figurative sense, when designed to bring out the fact that the court should not sit as an automaton

and approve any verdict returned by the jury. (*Stroup v. Northeast Oklahoma Rld. Co.*, 122 Kan. 587, 592, 253 Pac. 242.) With respect to the verdict, the court has a duty to perform independent of the jury, namely, the approval or disapproval of the verdict. In determining what should be done in that respect the court should consider the evidence much as the jury is required to consider it; that is, pass upon the credibility of witnesses and the weight to be given to the evidence and give consideration to the fact that twelve jurors have returned a certain verdict. But that is done, not for the purpose of reaching a verdict, but for the purpose of determining whether the verdict should be approved."

After such consideration, if the court approves the verdict, judgment should be rendered thereon for plaintiff; otherwise, the court should grant a new trial.

The judgment of the court below is reversed with directions to proceed further in harmony with this opinion.